No. 11-55016

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

TARLA MAKAEFF, Individually and on Behalf of All Others Similarly Situated,

Plaintiff-Counter-Defendant-Appellant,

vs.

TRUMP UNIVERSITY, LLC,

Defendant-Counter-Claimant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of California
No. 3:10-cv-00940-IEG(WVG)
The Honorable Irma E. Gonzalez

## PLAINTIFF-COUNTER-DEFENDANT-APPELLANT'S OPENING BRIEF

ROBBINS GELLER RUDMAN
  & DOWD LLP
ERIC ALAN ISAACSON (120584)
RACHEL L. JENSEN (211456)
AMANDA M. FRAME (253603)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ZELDES & HAEGGQUIST, LLP
AMBER L. ECK (177882)
625 Broadway, Suite 906
San Diego, CA 92101
Telephone: 619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiff-Counter-Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I.    JURISDICTION ............................................................................1

    A.    District-Court Jurisdiction...................................................1

    B.    Appellate Jurisdiction........................................................1

II.    QUESTIONS PRESENTED ......................................................3

III.    STANDARD OF REVIEW ........................................................3

IV.    STATEMENT OF THE CASE AND OF PERTINENT FACTS ..................4

    A.    Introductory Overview ......................................................4

    B.    Procedural History...........................................................11

    C.    Makaeff's Case Against Donald Trump's "University"....................15

        1.    Trump University's Promotion of Its "Free" Introductory Course ........................................................15

        2.    The "Free" Introductory Course ...............................20

        3.    The $1,495 One-Year "Apprenticeship" ....................27

        4.    The $34,995 "Trump Elite Gold" Program ................28

    D.    Trump University's Counterclaim and Makaeff's Motion to Strike.........................................................30

    E.    The District Court's Ruling................................................33

V.    SUMMARY OF ARGUMENT ..................................................36

VI.    ARGUMENT............................................................................38

626980_1

**Page**

A. California's Anti-SLAPP Statute Protects Tarla Makaeff's Communications About Donald Trump's "University" ....................38

B. Donald J. Trump and His "University" Are Public Figures for Purposes of the *New York Times v. Sullivan* Actual-Malice Test.......40

    1. Trump University Assumed the Role of a Public Figure by Holding Forth as a "University" ...........................................42

    2. Trump University Assumed the Role of a Public Figure by Thoroughly Identifying Itself with Donald J. Trump's Public Persona...................................................................47

    3. Trump University Is, at the Very Least, a Limited-Purpose Public Figure ................................................55

    4. Additional Judicially Noticeable Materials Confirm that Trump University Is a Public Figure .......................................61

C. The District Court Erred by Holding Makaeff's Statements Fall Outside California's Privilege for Pre-Litigation Communications................................................................63

D. Trump University Failed to Demonstrate Makaeff's Complaints Are Actionable Statements of Fact Rather than Rhetorical Expressions of Opinion ....................................................67

E. The District Court Erred by Holding that Trump University Need Not Demonstrate Actual Injury ................................71

VII. CONCLUSION.............................................................75

626980_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Albergo v. Immunosyn Corp.*,
  No. 09cv2653 DMS(AJB), 2011 U.S. Dist. LEXIS 5455 (S.D. Cal. Jan.
  20, 2011) ...................................................................................................74

*American Future Sys., Inc. v. BBB*,
  923 A.2d 389 (Pa. 2007) ...........................................................................61

*American Prods., Inc. v. Law Offices of Geller, Stewart & Foley, LLP*,
  37 Cal. Rptr. 3d 93 (Cal. App. 2005) ........................................................64

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................................39

*Arata v. City of Seattle*,
  No. C10-1551RSL, 2011 U.S. Dist. LEXIS 9870 (W.D. Wash. Jan. 25,
  2011) .........................................................................................................74

*Ascherman v. Natanson*,
  100 Cal. Rptr. 656 (Cal. App. 1972) .........................................................66

*Baker v. Los Angeles Herald Examiner*,
  721 P.2d 87 (Cal. 1986) .............................................................................67

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ...................................................................39

*Blanchard v. DIRECTV, Inc.*,
  20 Cal. Rptr. 3d 385 (Cal. App. 2004) ......................................................64

*Block v. Sacramento Clinical Labs Inc.*,
  182 Cal. Rptr. 438 (Cal. App. 1982) .........................................................66

*Brown v. Kelly Broad. Co.*,
  771 P.2d 406 (Cal. 1989) ...........................................................................72

**Page**

*Brown v. Memphis Publ'g Co.*,
  538 F.2d 699 (5th Cir. 1976) ...................................................71

*Brueggemeyer v. ABC*,
  684 F. Supp. 452 (N.D. Tex. 1988) ...........................................61

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*,
  633 F.2d 583 (1st Cir. 1980).....................................................59

*Byers v. Southeastern Newspapers Corp.*,
  288 S.E.2d 698 (Ga. App. 1982) ...............................................44

*Campanelli v. Regents of the Univ. of Cal.*,
  51 Cal. Rptr. 2d (Cal. App. 1996)..............................................67

*Conroy v. Spitzer*,
  83 Cal. Rptr. 2d 443 (Cal. App. 1999).......................................39

*Curtis Publ'g Co. v. Butts*,
  388 U.S. 130 (1967)...............................................10, 34, 41, 43

*Dockray v. Phelps Dodge Corp.*,
  801 F.2d 1149 (9th Cir. 1986) ....................................................5

*Dowling v. Zimmerman*,
  103 Cal. Rptr. 2d 174 (Cal. App. 2007)......................................39

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985)...................................................................71

*Edwards v. Centex Real Estate Corp.*,
  61 Cal. Rptr. 2d 518 (Cal. App. 1997)........................................64

*Equilon Enters. v. Consumer Cause, Inc.*,
  52 P.3d 685 (Cal. 2002).....................................................9, 39, 40

*Feldman v. 1100 Park Lane Assocs.*,
  74 Cal. Rptr. 3d 1 (Cal. App. 2008)............................................67

626980_1

**Page**

*Gallman v. Carnes*,
  497 S.W.2d 47 (Ark. 1973).................................................................44

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974).................................................................. *passim*

*Gilbert v. Sykes*,
  53 Cal. Rptr. 3d 752 (Cal. App. 2007).......................................39, 74

*Global Telemedia Int'l, Inc. v. Doe 1*,
  132 F. Supp. 2d 1261 (C.D. Cal. 2001) ...........................................73

*Governor Gray Davis Com'm. v. Am. Taxpayers Alliance*,
  125 Cal. Rptr. 2d 534 (Cal. App. 2002)............................................39

*Greenbelt Coop. Publ'g Ass'n v. Bresler*,
  398 U.S. 6 (1970)...............................................................68, 70

*Gregory v. McDonnell Douglas Corp.*,
  552 P.2d 425 (Cal. 1976) ................................................................68

*Greka Integrated, Inc. v. Lowry*,
  35 Cal. Rptr. 3d 684 (Cal. App. 2005)...............................................39

*Hagberg v. California Federal Bank*,
  81 P.3d 244 (Cal. 2004) .................................................................65

*Hentzen Contractors, Inc. v. Wichita*,
  814 P.2d 42, 1991 Kan. App. LEXIS 510 (Kan. App. 1991)............................53

*Howard v. Drapkin*,
  271 Cal. Rptr. 3d 893 (Cal. App. 1990)............................................65

*Hudgens v. Prosper, Inc.*,
  243 P.3d 1275 (Utah 2010).................................................................57

*Information Control Corp. v. Genesis One Computer Corp.*,
  611 F.2d 781 (9th Cir. 1980) .......................................................67, 69

- v -

**Page**

*Ithaca Coll. v. Yale Daily News Publ'g Co.*,
  433 N.Y.S.2d 530 (N.Y. App. Div. 1980), *aff'd*, 445 N.Y.S.2d 621 (N.Y.
  App. Div. 1981) ................................................................................................43

*Izusu Motors Ltd. v. Consumers Union of the United States, Inc.*,
  66 F. Supp. 2d 1117 (C.D. Cal. 1999) ..............................................................60

*Johnson v. Bd. of Junior Coll. Dist. #508*,
  334 N.E.2d 442 (Ill. App. 1975) ........................................................................44

*Komarova v. Nat'l Credit Acceptance*,
  95 Cal. Rptr. 3d 880 (Cal. App. 2009) ..............................................................65

*Liberal v. Estrada*,
  632 F.3d 1064 (9th Cir. 2011) ...........................................................................39

*Long Island Univ. v. Grucci for Cong., Inc.*,
  781 N.Y.S.2d 148 (N.Y. App. Div. 2004) .........................................................43

*Marie v. Allied Home Mortg. Corp.*,
  402 F.3d 1 (1st Cir. 2005) ...................................................................................2

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991) ...........................................................................................44

*McGarry v. Univ. of San Diego*,
  64 Cal. Rptr. 3d 467 (Cal. App. 2007) ..............................................................67

*Melaleuca, Inc. v. Clark*,
  78 Cal. Rptr. 2d 627 (Cal. App. 1998) ..............................................................72

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) ...............................................................................................68

*Mindys Cosmetics, Inc. v. Dakar*,
  611 F.3d 590 (9th Cir. 2010) .........................................................................2, 3

626980_1

**Page**

*Moore v. Conliffe*,
  871 P.2d 704 (Cal. 1994) ...................................................................65

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ..............................................................10, 40, 41, 44

*Rose v. Koch*,
  154 N.W.2d 409 (Minn. 1967) ..........................................................44

*Rosenthal v. Irell & Manella*,
  185 Cal. Rptr. 92 (Cal. App. 1982) ...................................................66

*Rubin v. Green*,
  847 P.2d 1044 (Cal. 1993) ....................................................64, 65, 66

*Rusheen v. Cohen*,
  128 P.3d 713 (Cal. 2006) ...................................................................66

*Sacramento Brewing Co. v. Desmond, Miller & Desmond*,
  89 Cal. Rptr. 2d 760 (Cal. App. 1999) .............................................66

*Schiavone Const. Co. v. Time, Inc.*,
  619 F. Supp. 684 (D.N.J. 1985), *aff'd in part, and rev'd in part on other
  grounds*, 847 F.2d 1069 (3d Cir. 1988) ...........................................53

*Sengchanthalangsy v. Accelerated Recovery Specialists, Inc.*,
  473 F. Supp. 2d 1083 (S.D. Cal. 2007) .............................................64

*Serrano v. 180 Connect, Inc.*,
  478 F.3d 1018 (9th Cir. 2007) .............................................................1

*Silberg v. Anderson*,
  786 P.2d 365 (Cal. 1990) ..............................................................65, 66

*Steaks Unlimited v. Deaner*,
  623 F.2d 264 (3rd Cir. 1980) ........................................................59, 60

626980_1

**Page**

*Sunshine Sportswear & Electronics, Inc. v. WSOC Television*,
    738 F. Supp. 1499 (D.S.C. 1989) .......................................................60

*Time, Inc. v. Firestone*,
    424 U.S. 448 (1976)...........................................................................55, 56

*Underwager v. Channel 9 Australia*,
    69 F.3d 361 (9th Cir. 1995) ...............................................68, 69, 70

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir. 1999) .........................................................38, 39

*University of the South v. Berkley Publ'g Corp.*,
    392 F. Supp. 32 (S.D.N.Y. 1974) .....................................................43

*Vegod Corp. v. ABC*,
    603 P.2d 14 (Cal. 1979).............................................................47, 58, 59

*Vess v. Ciba-Geigy Corp., USA*,
    317 F.3d 1097 (9th Cir. 2003) .........................................................39

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    592 F.3d 954 (9th Cir. 2010) .............................................................5

*Walko v. Kean College*,
    561 A.2d 680 (N.J. Super. 1988) .....................................................44

*Wilcox v. Superior Court*,
    33 Cal. Rptr. 2d 446 (Cal. App. 1994).............................................38

*Wolston v. Reader's Digest Ass'n*,
    443 U.S. 157 (1979)...........................................................................55

*Zamani v. Carnes*,
    491 F.3d 990 (9th Cir. 2007) ...........................................................2

**Page**

**CONSTITUTION, STATUTES, RULES AND REGULATIONS**

United States Constitution
First Amendment ......................................................................40, 43, 67

United States Code
28 U.S.C.
§1291 ....................................................................................................3
§1332(d) ...............................................................................................1
§1332(d)(2) ..........................................................................................1
§1367(a) ...............................................................................................1

Federal Rules of Appellate Procedure
Rule 4(a)(4) ..........................................................................................2

Federal Rules of Civil Procedure
Rule 59(e) .............................................................................................2
Rule 60(b) .............................................................................................2

Federal Rules of Evidence
Rule 802 .............................................................................................74

California Civil Code
§47(b) ...................................................................................64, 65, 66

California Code of Civil Procedure
§425.16 .......................................................................................*passim*
§425.16(a) ..........................................................................................38
§425.16(b)(1) ...............................................................9, 34, 39, 40
§425.16(b)(2) .....................................................................................40

Kansas Supreme Court Rules
Rule 7.04(f)(2)(ii) ............................................................................54

**Page**

SECONDARY AUTHORITIES

9 *Fletcher's Cyclopedia of the Law of Corporations* §4255.50 (2010) .................53

Comment, *Strategic Lawsuits Against Public Participation: An Analysis of the Solutions*, 27 Cal. Western L. Rev. 399 (1991).............................................40

Robert D. Sack, *Sack on Defamation: Libel, Slander and Related Problems* §5:3.5 (4th ed. 2010).............................................................................61

Donald J. Trump & Meredith McIver *Trump 101: The Way to Success* (2008) ............................................................62

Donald J. Trump & Meredith McIver, *Trump: Never Give Up: How I Turned My Biggest Challenges Into Success* (2008)...................................62, 63

626980_1

## I.    JURISDICTION

### A.    District-Court Jurisdiction

Tarla Makaeff, a citizen of California, commenced a class action against Trump University, a citizen of New York, over which the district court had subject-matter jurisdiction based on diversity of citizenship under 28 U.S.C. §1332(d)(2), enacted by the Class Action Fairness Act ("CAFA"), because the proposed class contains more than 100 persons, some of whom are residents of states other than New York, and the aggregate amount in controversy exceeds $5 million.  *See* 28 U.S.C. §1332(d)(2); ER0342(CR1:¶7); ER0261(CR10:¶19).

Trump University counterclaimed against Makaeff, invoking the supplemental jurisdiction provided by 28 U.S.C. §1367(a).  *See* ER0305-06(CR4:¶¶6-7).

Although a First Amended Complaint filed June 16, 2010, added additional named plaintiffs, including Patricia Murphy, a citizen of New York, ER0262-65(CR10:¶¶22-26), Murphy's New York citizenship does not destroy the "minimal diversity" sufficient for a CAFA class action under 28 U.S.C. §1332(d).  *See Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1021 (9th Cir. 2007).

### B.    Appellate Jurisdiction

This appeal is taken from the district court's order denying Tarla Makaeff's motion, under California Code of Civil Procedure §425.16, to strike Trump University's million-dollar counterclaim for defamation as a "Strategic Litigation

- 1 -

626980_1

Against Public Participation" or "SLAPP" suit, ER0004-15(CR24), a timely motion for reconsideration of which the district court denied. ER0001-03(CR40).

The order denying Makaeff's anti-SLAPP motion to strike Trump University's counterclaim under §425.16 is an appealable collateral order. *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010). Such appealable collateral orders are subject to Federal Rule of Appellate Procedure 4(a)(4)'s provision that a timely motion to reconsider under Federal Rules of Civil Procedure 59(e) or 60(b), filed within 28 days after the collateral order's entry, tolls the time for noticing an appeal. *See Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007) (appeal following denial of motion for reconsideration); *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 7-8 (1st Cir. 2005) ("A timely motion to alter or amend a 'judgment' that is an appealable interlocutory order tolls the time for filing a notice of appeal.").

Here, the district court's appealable collateral order denying Makaeff's anti-SLAPP motion was entered August 23, 2010. ER0004-15(CR24). Makaeff's timely motion for reconsideration was filed 28 days later, on September 20, 2010. ER0140-43(CR31). The district court's order denying reconsideration was entered December 6, 2010. ER0001-03(CR40).

Makaeff timely filed her notice of appeal on January 3, 2011. ER0033-39(CR43).

626980_1

This Court thus has jurisdiction under the collateral-order doctrine and 28 U.S.C. §1291.

## II.    QUESTIONS PRESENTED

1.    Did the district court err in holding that Trump University's defamation counterclaim cannot be dismissed as a SLAPP suit under California Code of Civil Procedure §425.16 because it concluded that Donald J. Trump's so-called "University" is not a "public figure" required to prove "actual malice"?

2.    Are Makaeff's pre-litigation communications and efforts to mediate her dispute excluded from California's privilege for communications related to anticipated litigation?

3.    Did Trump University sufficiently demonstrate that what it characterizes as Makaeff's "defamatory rhetoric" actually amounted to false statements of fact rather than statements of opinion and rhetorical hyperbole?

4.    Did the district court err by ruling that Trump University need not demonstrate a probability that it suffered any actual injury from Makaeff's statements concerning a matter of public concern?

## III.   STANDARD OF REVIEW

This Court reviews "de novo a district court's denial of a motion to strike under California's anti-SLAPP statute." *Mindys Cosmetics*, 611 F.3d at 595.

## IV.   STATEMENT OF THE CASE AND OF PERTINENT FACTS

### A.   Introductory Overview

One of America's most flamboyant public figures, Donald J. Trump, is the founder, chairman, face, voice, and central attraction of counterclaimant Trump University, which promotes itself as an educational institution through which Mr. Trump offers students an education in finance and real-estate methods, supposedly teaching them "insider success secrets from Donald Trump." *See* ER0266-69(CR10:¶¶30-37).  Holding forth as Donald Trump's "University," it has naturally drawn to itself significant attention and media coverage, as is evidenced by, for example, articles referenced in the complaint, including David Lazarus's December 2007 columns for the *Los Angeles Times*, titled *Trump Spins in Foreclosure Game*[1] and *Trump's a Grump About Column on His "Priceless" Tips*,[2] Douglas Feiden's April 16, 2010, article for the *New York Daily News* titled *State Educrats*

---

[1]     ER0266(CR10:¶30 & n.3) (citing and providing a url hyperlink to David Lazarus, *Trump Spins in Foreclosure Game*, Los Angeles Times, Dec. 12, 2007. (online at http://www.latimes.com/business/la-fi-lazarus12dec12,0,7835610.column (accessed May 25, 2011).  *See* RJN Ex. A.  The complaint erroneously gives the date of publication as 2009 rather than 2007.

[2]     ER0266(CR10:¶30 & n.4) (citing and providing a url hyperlink to David Lazarus, *Trump's a Grump About Column on His "Priceless" Tips*, Los Angeles Times, Dec. 16, 2007 (online at http://www.latimes.com/business/la-fi-lazarus16dec16,0,1670633.column (accessed May 25, 2011).  *See* RJN Ex. B.  The complaint inadvertently gives the year of publication as 2009.  ER0266(CR10:¶30).

*Give Failing Grade to Donald Trump's "Misleading" Trump University*,[3] and Lynn O'Shaughnessy's April 19, 2010, piece for *CBS MoneyWatch* titled *Is Trump University Flunking Out?*[4]

These articles, referenced in the complaint, are themselves judicially noticeable.[5]  So is the fact that coverage of Trump University continues as this case proceeds[6] – with the *New York Times*, for example, lately reporting on the New York Attorney General's ongoing investigation of Trump University, as a for-profit school that

> is built almost entirely around the prestige and prominence of a single individual.  [Mr. Trump – the real estate developer, product salesman and reality-television star –] said he created the university in 2005 to

---

[3]  ER0274(CR10:¶54 & n.9) (citing Douglas Feiden, *State Educats Give Failing Grade to Donald Trump's "Misleading" Trump University*, *New York Daily News*, April 16, 2010 (online at http://articles.nydailynews.com/2010-04-16/news/27061901_1_donald-trump-dunce-cap-trump-university (accessed May 25, 2011)).  *See* RJN Ex. C.

[4]  ER0274(CR10:¶54 & n.9) (citing Lynn O'Shaughnessy, *Is Trump University Flunking Out?*, *CBS MoneyWatch*, April 19, 2010 (online at http://moneywatch.bnet.com/spending/blog/college-solution/is-trump-university-flunking-out/1913/ (accessed May 25, 2011)).  *See* RJN Ex. D.

[5]  *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149, 1153 n.3 (9th Cir. 1986).  An accompanying Request for Judicial Notice provides copies of the foregoing articles for the Court's convenience.

[6]  *See* RJN Exs. F-T.

- 5 -

impart decades' worth of his business acumen to the general public. He aggressively marketed the school, telling students that his hand-picked instructors would "teach you better than the best business school . . . ."

The school has charged premium prices because of the Trump name, with the cost of courses ranging from $1,500 to $35,000 each.[7]

Impressed by Trump University's identification with Donald Trump, Tarla Makaeff and literally thousands of others have paid $1,495 for a "one year apprenticeship" that turns out to be a three-day "workshop" designed primarily to upsell participants to enroll in a $34,995 "Trump Elite Gold Program" promising a "full education" in Mr. Trump's methods, plus skilled mentorship in their execution. ER0258-87(CR10:¶¶10-88).

Persuaded by Trump University's pitch Makaeff, in particular, was induced first to attend a $1,495 "Fast Track to Foreclosure" workshop, from which she then entered Trump University's $34,495 "Gold Elite Program" – enthusiastically embarking on what was said to afford a complete education in Trump's financing and real-estate methods, plus skilled mentorship in executing lucrative real-estate transactions. ER0262, ER0278-81(CR10:¶¶22, 57-64). Her initial enthusiasm soon turned to disappointment, however, as she found Donald Trump's "University," despite its very

---

[7]   Michael Barbaro, *New York Attorney General Is Investigating Trump's For-Profit School*, The New York Times, May 19, 2011, (online at http://www.nytimes.com/2011/05/20/nyregion/trumps-for-profit-school-said-to-be-under-investigation.html?hp (accessed May 25, 2011). *See* RJN Ex. F.

- 6 -

high cost and close identification with Donald Trump, provided virtually nothing of value.

After Makaeff's repeated requests for refunds were rebuffed, she wrote a September 10, 2009, letter to Bank of America's Debit Dispute Department, ER0220-37(CR15-1/Ex.A:8-25) (Sept. 10, 2009 letter), complaining of Trump University's deceptive business practices, asking that certain charges to her bank debit card be reversed, and promising "to go to whatever lengths necessary to obtain my money back including taking legal action." ER0223(CR15-1/Ex.A:11). She also wrote to the Better Business Bureau ("BBB") whose attempt to mediate her dispute failed. ER0239-45(CR15-1/Ex.A:26-32).

Both letters charged Trump University with what Makaeff believed to be deceptive and unethical business practices. Written by a distraught consumer who believed she had been bilked out of a substantial sum of money, both letters also included some fairly hyperbolic rhetoric, characterizing certain sales tactics as akin to "brainwashing," whose results amounted, in her view, to "grand larceny." Makaeff's bank, and the BBB mediator assigned to her case, both apparently passed Makaeff's complaints on to Trump University, affording it an opportunity to respond.

In light of the many complaints it received from students like Makaeff, and Trump University's apparently unsatisfactory responses, the BBB gave Trump University a "D-" rating in January 2010, and in April of 2010, New York's

Department of Education warned Donald Trump's "University" that "use of the word 'university' by your corporation is misleading and violates New York Education Law and the Rules of the Board of Regents." ER0274(CR10: ¶54). Such events received substantial media coverage, doubtless in large measure due to Trump University's identification with Donald Trump.[8]

Yet Makaeff received no refund. With the failure of the BBB's attempted mediation, Makaeff filed suit in April 2010, ER0339-73(CR1), just as her September 10, 2009, letter to her bank had said she would. *See* ER0223(CR15-1/Ex.A:11). Finding that many others who had enrolled in Trump University's programs believed that they too had been cheated, *see* ER0273(CR10:¶53), Makaeff filed a class-action lawsuit against Donald Trump's "University." ER0339-73(CR1).

To this Trump University responded with a counterclaim asserting that "defamatory rhetoric" it lifted out of context from Makaeff's earlier letters to her bank

---

[8]    ER0274(CR10:¶54 & n.9). The complaint cites two articles as examples of that coverage: Douglas Feiden, *State Educrats Give Failing Grade to Donald Trump's "Misleading" Trump University*, New York Daily News, April 16, 2010 (online at http://articles.nydailynews.com/2010-04-16/news/27061901_1_donald-trump-dunce-cap-trump-university (accessed May 25, 2011)), and Lynn O'Shaughnessy, *Is Trump University Flunking Out?*, *CBS MoneyWatch*, April 19, 2010 (online at http://moneywatch.bnet.com/spending/blog/college-solution/is-trump-university-flunking-out/1913/ (accessed May 25, 2011)). *See* RJN Exs. C-D.

and the BBB had done it great harm.[9]  Asserting that Makaeff "found herself in a 'precarious financial position,'" and "desperate for cash," Trump University demanded damages for Makaeff's so-called "defamatory rhetoric" that it claimed "may equal or exceed $1,000,000."[10]

Makaeff moved to strike Trump University's million-dollar counterclaim under California Code of Civil Procedure §425.16(b)(1), which provides "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." *See Equilon Enters. v. Consumer Cause, Inc.*, 52 P.3d 685, 688 (Cal. 2002).

---

[9]     *See* ER0311-2(CR4:¶22) (alleging that statements drawn from Makaeff's September 10, 2009, letter to her bank constitute actionable "defamatory rhetoric"); ER0312-13(CR4:¶23) (alleging that statements that are drawn from the BBB's November 2, 2009, letter communicating Makaeff's complaints to Trump University were part of a "campaign to malign and defame Trump University"); *compare* ER0220-37(CR15-1/Ex.A:8-25) (reproducing the Tarla Makaeff's September 10, 2009, letter to her bank from which the allegedly "defamatory rhetoric" in Counterclaim ¶22 is drawn); ER0239-45(CR15-1/Ex.A:26-32) (reproducing the BBB mediator's November 2, 2009, letter, from which the allegedly defamatory statements in Counterclaim ¶23 are drawn).

[10]     ER0310-14(CR4:¶¶19(j), 22, 31).

- 9 -

Finding that Makaeff's two letters and alleged (but unidentified) Internet postings qualify as constitutionally protected speech on matters of public interest covered by §425.16, *see* ER0007-09(CR24:4-6), the district court nonetheless denied Makaeff's motion to strike. ER0015(CR24:12). Because Donald Trump's "University" could not, in the district court's view, be deemed a "public figure" required to prove "actual malice" under *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 133-34 (1967), and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 133-34 (1974), it found Trump University had demonstrated a "probability that [it] will prevail on the claim" for defamation if permitted to proceed to trial. ER0007-11, 0015(CR24:4-8, 12).

Although Makaeff's September 10, 2009, letter had promised litigation – temporarily forestalled for the BBB's attempted mediation – the district court rejected application of California's privilege for pre-litigation communications because Makaeff had sought through her letter and BBB mediation to "obtain a refund in order to avoid litigation." ER0014(CR24:11).

Although Trump University lifted what it called "defamatory rhetoric" from a distraught consumer's letters of complaint to her bank's debit-dispute department and BBB mediator, the district court ruled that the letters' readers would not understand Makaeff's rhetorical hyperbole as impassioned expressions of opinion. ER0011-13(CR24:8-10).

Although controlling precedent required Trump University, if it need not show actual malice, to at least show that Makaeff's statements relating to a matter of public concern had caused it actual injury, the district court ruled that Trump University could recover "without proof of special damages." ER0012(CR24:9).

The district court denied Makaeff's timely motion for reconsideration. ER0001-03(CR:40).

## B. Procedural History

This appeal arises from a counterclaim for defamation *per se* filed by Donald J. Trump's "Trump University" against Tarla Makaeff, a former student, who dared to sue it. Donald Trump's "University" contends that Makaeff's "defamatory rhetoric," which it lifts out of context from a letter she sent to her bank, and from a complaint she lodged with the BBB, together with Internet postings it does not identify, have caused it damages that may exceed one million dollars. ER0311-14(CR4:¶¶22-23, 31).

Makaeff's class action against Trump University commenced on April 30, 2010, when she filed a class-action complaint recounting how she and a friend had paid $1,495 for a three-day "Fast Track to Foreclosure" workshop, at which she was induced to enroll in Trump University's $34,995 "Trump Gold Elite Program," promising a full education in real-estate finance methods, plus a year-long mentorship in actually executing lucrative real-estate transactions. *See* ER0342-50(CR1:¶¶10, 13-

- 11 -

35); *see* ER0262-63, 0267(CR10:¶¶22-23, 32). Makaeff's complaint noted that the BBB gave Trump University a "D-" rating in January 2010, that New York's Department of Education had found its use of the word "University" misleading and unlawful, and that many of its students had lodged complaints against it on the Internet. ER0350-54(CR1:¶¶36-37); *see* ER0274-78(CR10:¶¶54-55). On behalf of a class of similarly situated Trump University students, Makaeff sought relief on a variety of theories under California and New York law. ER0359-67(CR1:¶¶53-114); *see* ER0287-300(CR10:¶¶89-169).

Trump University responded with a counterclaim filed May 26, 2010, demanding $1-million in damages from Makaeff for what it characterized as "defamatory rhetoric" lifted from a September 10, 2009, letter that Makaeff sent to her bank asking that certain debit-card charges be reversed, and from her subsequent complaint to the BBB, that a BBB mediator forwarded to Trump University hoping to mediate the dispute.[11]

After filing a somewhat expanded First Amended Complaint ("FAC") adding several additional named plaintiffs on June 16, 2010, ER0255-301(CR10), Makaeff

---

[11] ER0311-14(CR4:¶¶22, 23, 31); *see* ER0220-37(CR15-1/Ex.A:8-25) (September 10, 2009, letter); ER0239-45(CR15-1/EX A:26-32 (November 2, 2009, letter from BBB mediator to Trump University).

moved to strike Trump University's defamation counterclaim as a SLAPP suit under California Code of Civil Procedure §425.16. *See* ER0246-49(CR14).

The district court denied Makaeff's motion to strike Trump University's defamation counterclaim in the appealable collateral order entered August 23, 2010, that is the subject of this appeal. *See* ER0004-15(CR24).

In an order entered October 12, 2010, the district court granted only in part Trump University's motion to dismiss the FAC, sustaining claims for breach of contract, breach of implied covenant, money had and received, and violation of California's Unfair Competition Law, and allowing plaintiffs leave to file a further pleading stating claims for fraud and deceit with greater particularity. ER0126-39(CR33).

Makaeff on September 12, 2010, filed her timely motion for reconsideration of the district court's August 23, 2010, order refusing her motion to strike Trump University's counterclaim. *See* ER0140-43(CR31). The district court denied that motion on December 6, 2010. ER0040-102(CR41).

A Second Amended Complaint ("SAC") was filed December 16, 2010, dropping one of the named plaintiffs (because Trump University refunded her outlay) and adding Donald J. Trump, Sr., as an additional named defendant. ER0040-102(CR41).

Makaeff timely filed her appeal on January 3, 2011. ER0033-39(CR43).

- 13 -

Motions to dismiss filed by both Trump University and Donald Trump were denied in greatest part by orders entered May 16, 2011. ER0025-32(CR69); ER0016-24(CR70). The district court sustained most of the SAC's claims for fraud, misrepresentation and deceit as against Trump University, as well as its claims for breach of contract and false advertising. ER0016-24(CR70). The district court also sustained most claims against Donald Trump, observing:

> As the face of Trump University, Donald Trump appeared on the Trump University website and in advertisements. The website contained headings such as "Learn from the Master," and "Are YOU My Next Apprentice? Prove it to me!" In certain instances, the advertisements took the form of personal letters from Trump himself. In one exemplary letter, Trump stated:
>
>> "I only work with people who are committed to succeed. I founded Trump University back in 2005 to teach go-getters how to succeed in real estate. My team at Trump University is filled with real estate experts . . . proven winners. We're the best of the best and we know what works. If you think you have what it takes to be my next apprentice, prove it to me."
>
> In another letter, Trump stated, "My hand-picked instructors and mentors will show you how to use real estate strategies . . . ." And so on.

ER0026(CR69:2). "In this case," the court underscored, "Plaintiffs signed up for Trump University seminars for a specific reason: to 'Learn from the Master,' Donald Trump." ER0029(CR69:5).

### C.     Makaeff's Case Against Donald Trump's "University"

The operative complaint alleges that Donald Trump created Trump University in 2005, and that his purported institution of higher learning has shamelessly traded on its identification with his name, reputation, and image – typically picturing Mr. Trump as speaking in the first person on its behalf.   The complaint details the basis for Makaeff's contention that Donald Trump's so-called "University" really is a scam designed to separate its students from their money.

### 1.     Trump University's Promotion of Its "Free" Introductory Course

That Trump University aggressively trades on Donald Trump's public persona cannot be disputed.   Describing how Trump University promotes its "free" introductory courses in Donald Trump's name, the complaint both references and hyperlinks to David Lazarus's December 12, 2007, column in the *Los Angeles Times*, which deemed newsworthy Trump University's ad in that very newspaper portraying Donald Trump promising in the first person: "I'm going to give you 2 hours of access to one of my amazing instructors AND priceless information . . . all for FREE."[12]   The complaint also cites and hyperlinks to Lazarus's December 16, 2007, follow-up

---

[12]     ER0266(CR10:¶30).   *See* RJN Ex. A (David Lazarus, *Trump Spins in Foreclosure Game*, Los Angeles Times, Dec. 12, 2007 (online at http://www.latimes.com/business/la-fi-lazarus12dec12,0,7835610.column (accessed May 25, 2011)).

- 15 -

column titled *Trump's a Grump About Column on His "Priceless" Tips,* which noted that Trump University's mass-market ads quoted Donald Trump as asserting that "investors nationwide are making millions in foreclosures . . . and so can you!"[13] Lazarus reported that Donald Trump took such deep umbrage at the preceding week's description of his "University" that Mr. Trump both personally threatened to sue Mr. Lazarus and then urged the *Los Angeles Times* to fire the columnist.[14]

---

[13]     ER0266(CR10:¶30).

[14]     David Lazarus, *Trump's a Grump About Column on His "Priceless" Tips*, Los Angeles Times, Dec. 16, 2007 (online at http://www.latimes.com/business/la-fi-lazarus16dec16,0,1670633.column (accessed May 25, 2011); *see* RJN Ex. B.

The basic theme of Trump University's print ads in major papers such as the *Los Angeles Times* was replicated across the Internet. The complaint presents several examples, showing how Donald Trump promoted Trump University as his own personal operation. One, telling consumers they can "Learn from the Master," portrayed Donald Trump speaking in the first-person as Trump University's Chairman, declaring that "I can turn anyone into a successful real estate investor":



ER0266(CR10:¶30).

Another typical Trump University Internet ad said "It's the next best thing to being his Apprentice," picturing Donald Trump as it offered the opportunity through his Trump University to "Learn the Trump System of Real Estate Investing" and to "Discover Donald Trump's strategies for wealth creation":



ER0266(CR10:¶30).

Yet another promotional advertisement, styled as "A Private, Limited-Time Only Invitation from Trump University," promised "Insider Success Secrets from Donald Trump":



ER0266(CR10:¶30).

The point of these and other ads was clearly to tie Trump University directly to Donald Trump's conspicuous public persona, and to trade on his image as a public figure.

- 19 -

### 2. The "Free" Introductory Course

Those who answered such ads by attending one of Trump University's "free" two-hour introductory courses were greeted by tall banners featuring Donald Trump's image, and were treated to a scripted presentation again driving home Trump University's identification with Donald Trump and his financial empire. ER0267-69(CR10:¶¶31-37). The presentation's slides portrayed Donald Trump's "University" as just one aspect of the Trump empire's "75 Years of Success":



ER0267(CR10:¶32).

Trump University's scripted presentation then told the story of "Donald J. Trump:  An American Icon," blatantly trading on the public figure's personal and professional identity, calling attention to Donald J. Trump, "The Personality TRUMP Brand," to Donald J. Trump "The Real Estate Tycoon," and finally, to Donald J. Trump, "The Educator":



ER0267-68(CR10:¶33).



ER0267-68(CR:¶33).



ER0267-68(CR10:¶33). "The Educator" slide pictured some of Donald Trump's many books, including several that he had published in collaboration with and under the auspices of his "University." *See* ER0267-68(CR10:¶33).

With Trump University's identification with Donald J. Trump, an "American Icon," "Real Estate Tycoon," and "Educator" thus firmly established, the script called for the speaker to say that because Donald Trump's television show *The Apprentice*, permitted Mr. Trump to work with but one person a year, he created Trump University – not to make money for himself, but to teach others. ER0267-68(CR10:¶33). With Trump University's apprenticeship program, the script ran, "Mr. Trump takes you

- 23 -

through an entire apprenticeship for one year." ER0267-68(CR10:¶33). Trump University, it said, "is owned, lock and stock and barrel by Mr. Trump – it's his 'baby,' his company, designed to help him accomplish his goal of leaving a legacy." ER0267-68(CR:¶33). For Donald Trump's "University" purportedly teaches time-tested strategies that have been in the Trump family for over 75 years, and that can be employed by ordinary people to pay off credit cards and other personal debt, to fully fund retirements, and to finance children's college educations. ER0268(CR10:¶34).

"The Apprenticeship Program," with a nominal price tag of $1,995, was marketed to Makaeff and others at a purported discount price of $1,495, for a one-year program providing "A Proven Investing System" and "step-by-step process for profitable investing," employing "Specialized Knowledge" supposedly "Based on the investing experience of Donald J. Trump," and offering "One full year of expert, interactive support" to assist students in executing the real-estate transactions taught:



ER0268(CR10:¶34).



ER0268(CR10:¶34).

The presentation's whole point: To drive home Trump University's thoroughgoing identification with Donald Trump's public persona, and induce participants to part with $1,495 to enroll in Trump University's one-year "Apprenticeship Program," by promising "A Comprehensive Real Estate Education," from instructors and mentors "'hand-picked by Trump.'" ER0268-69(CR10:¶¶35-37).

- 26 -

### 3. The $1,495 One-Year "Apprenticeship"

Those who spend the $1,495 on "The Apprenticeship Program" promising "A Comprehensive Real Estate Education" and "One full year of expert, interactive support," actually receive what amounts to a three-day sales pitch designed to upsell participants to a further, and far more expensive, "Trump Elite Gold" program, plus a phone number to a so-called "client advisor," with a Wall Street address, to field their calls in the coming year. *See* ER0268-69(CR10:¶¶35-36); *see* ER0269-72(CR:¶¶38-46).

The three-day session is truly a hard-sell sales pitch. Trump University's purported faculty repeatedly urge students to call their credit-card companies during breaks, and to quadruple their credit-card charge limits, so they can use their newly increased lines of credit to get started in profitable real-estate transactions. ER0269-70(CR10:¶39). Students are asked to fill out detailed personal financial statements, which Trump University's representatives then review with them – purportedly to counsel them in real estate transactions, but in truth to assess how much might be extracted from them for the next level of Trump seminars. ER0269-70(CR10:¶39).

At the workshop's close, Trump University's representatives urge students to use their newly increased lines of credit not to execute real-estate transactions, but to purchase Trump University's next level of higher education, the "Trump Elite Gold Program," typically for $34,995. ER0269-70(CR10:¶39). Those who cannot swing

- 27 -

the $34,995 price tag are urged to buy into the "Trump Silver Elite" program for $19,495, or the "Trump Bronze Elite" seminar at just $9,995. ER0269-70(CR10:¶39). These prices are presented as "one day only" specials, supposedly representing substantial "Savings" compared to the "regular" prices of $48,490 for Gold Elite, $23,490 for Silver Elite, and $10,995 for the Bronze Elite. ER0269-70(CR10:¶39); *see* ER0302(CR10/Ex.A). Trump University representatives encourage students to max out their credit cards to pay for the $34,995 program, falsely telling them "you'll make it back in 30 or 60 or 90 days." ER0270(CR10:¶41). Trump University's Tiffany Brinkman persuaded Makaeff to enroll by telling her that her first real-estate deal would earn her in the ballpark of $35,000, recovering the cost of the program. ER0278(CR10:¶58).

Makaeff took advantage of the "Event Special You Save 28%" offer to sign up for the Gold Elite Program at $34,995, putting $5,000 of the total on her Bank of America debit card. ER0269-70, 0278(CR10:¶¶39, 56-58); ER0302(CR10/Ex.A) (Makaeff's copy of her Trump University "Enrollment Form"); *see also* ER0318(CR4/Ex.B) (Trump University's copy of Makaeff's "Enrollment Form").

### 4. The $34,995 "Trump Elite Gold" Program

Trump University students receive stunningly little in return for their $34,995 tuition.

- 28 -

Though the $34,995 "Trump Elite Gold" program promises a three-day "Field Mentorship" with real-estate experts and investors, all students get is two days with "mentors" looking at listed properties (which they might do with a realtor for free), plus a half-day visit to a local Home Depot, lunch, and perhaps an hour discussing "numbers." ER0273(CR10:¶50). Mentors spend little or no time discussing contracts essential to the real-estate transactions mentioned in the seminar. They then typically disappear, without providing the promised year of hands-on mentorship in executing real estate transactions. ER0273(CR10:¶50).

Though Trump University promises to teach students how to execute various complex real-estate transactions, even after placing many phone calls to Trump University, Makaeff and her classmates were never instructed in use of the contracts needed for the transactions described. ER0273(CR10:¶53).

Some Trump methods in which students were instructed turned out to be illegal, such as posting roadside "bandit signs" that mimic black-and-yellow traffic-warning signs, but say "WE BUY HOUSES," providing a phone number. After posting such signs, as instructed by Trump University, Makaeff was contacted by a California District Attorney's office which informed her that the signs were illegal – requiring Makaeff to retain the services of a criminal-defense attorney. ER0280(CR10:¶63).

One thing the Trump Gold Elite program did provide: constant upsell pressure to buy still more Trump University affiliate programs and products, at prices ranging

from $495 to $9,995. ER0273(CR10:¶51). Induced to enroll in further seminars, Makaeff wound up expending more than $60,000. ER0279(CR10:¶60).

### D. Trump University's Counterclaim and Makaeff's Motion to Strike

Trump University responded to Makaeff's class action with a counterclaim against her, citing "defamatory rhetoric" that it lifted out of context from two letters – one that she, as a distraught consumer, had sent to her bank, seeking reversal of certain charges to her account, and another from a BBB mediator forwarding Makaeff's complaints to Trump University for its response. ER0303-38(CR4). Although Trump University asserted that Makaeff's "personal financial condition had deteriorated to the point that she became desperate for cash," its counterclaim sought to recover damages from her that "may equal or exceed $1,000,000." ER0314(CR4:¶31).

Makaeff moved to strike the counterclaim, *see* ER0246-49(CR14), as a SLAPP suit under California Code of Civil Procedure §425.16, submitting a declaration attesting that when she sent letters to governmental agencies, her banks, and the BBB, any "statements I made about Trump University were statements . . . of Trump University's practices in its seminars," and that "I did not make any statements about Trump University that I knew were false, nor did I have serious doubts about the truthfulness of any of the statements I made about Trump University." ER0251(CR14-2:¶¶2, 4, 5).

- 30 -

Only after Makaeff moved to strike Trump University's counterclaim under §425.16, did the specific sources of its allegations become clear. Trump University opposed Makaeff's motion to strike with a declaration of Trump University's President Michael Sexton which attached as exhibits Makaeff's September 10, 2009, letter to her bank, ER0220-37(CR15-1/Ex.A:8-25), and a November 2, 2009, letter from a BBB mediator, Jihan Varisco, transmitting Makaeff's complaints to Trump University in hope of reaching a mediated settlement. ER0239-45(CR15-1/Ex.A:26-32).

The allegedly "defamatory rhetoric" quoted in Counterclaim ¶22 was drawn from Makaeff's September 10, 2009, letter asking her bank to reverse three charges: an August 12, 2008 debit of $5,000 and September 2, 2008, debit of $100 to Trump University, and a November 3, 2008, debit of $4,995 to the Trump-related Profit Publishing Group. *See* ER0220(CR15-1/Ex.A:8). Submission of the letter as an exhibit to Sexton's declaration made clear that the bank had forwarded the document to Trump University, that it might respond to Makaeff's somewhat emotional charges that Trump University and Profit Publishing had engaged in

> deceptive business practices, illegal predatory high pressure closing tactics, enrolling students for new credit cards they cannot afford for "real estate" transactions then coercing students to pay for the $34,995 Trump University mentorship and courses as well as the $4,995-$9,995 Profit Publishing Group entity creation package through debits or immediately with the cards as this is "good at this seminar only (with no) rainchecks" and other hard closing tactics.

- 31 -

ER0220-21(CR15-1/Ex.A:8-9).

Makaeff opined, as a layperson, that "[t]hese business practices are criminal in nature as they fall under the Fraud statutes of all states and the Federal government." ER0221(CR15-1/Ex.A:9). "I can only liken it to a brainwashing scheme," she wrote, "that is so powerfully convincing initially that you do not realize you are being severely taken advantage of until you have completed the mentorships, attended all courses, and paid for the entity creation only to find that true answers that are promised to be revealed and services that are promised to be rendered at later courses and dates are never finally given, requiring more and more spending." ER0222(CR15-1/Ex.A:10).

Makaeff wrote of what she regarded as "fraudulent sales techniques" that she believed to be governed by state and federal laws protecting "consumers such as me against this outright Fraud, Grand Larceny, and Identity Theft by Trump University/Profit Publishing Group." ER0222(CR15-1/Ex.A:10). She also noted that "particulars on the law are for you to judge," adding that in matters of law "I'm not the expert." ER0233(CR15-1/Ex.A:21).

Nonetheless, she wrote that "based on discussions with counsel," she had concluded that "there was a gargantuan amount of misleading, fraudulent, and predatory behavior taking place that suggests legal cause for action." ER0227(CR15-1/Ex.A:15). And Makaeff was ready "to go to whatever lengths [are] necessary to

- 32 -

obtain my money back including taking legal action at the state and federal levels for this crime that has been committed to thousands of students nationwide who have been prayed on and victimized as I know I am one of many." ER0223(CR15-1/Ex.A:11). *See* ER0220(CR15-1/Ex.A:8).

Additional supposedly defamatory rhetoric, quoted in Trump University's Counterclaim ¶23, was lifted from a November 2, 2009, letter from Jihan Varisco, a BBB mediator, to Trump University's Brad Schneider, conveying "information from one of your customers expressing concern with a recent business transaction," and asking Trump University to "please review this information and respond." ER0239(CR15-1/Ex.A:26). Makaeff's central charge: "Trump University representatives misled me," and failed to "provide what I signed up for." ER0240-41(CR15-1/Ex.A:27-28).

In a supplemental declaration, Makaeff again attested that she believed her statements were true, pointed out that they all had to be read *in context*, and that some related not to Trump University, but to several related entities – Profit Publishing Group, the Childers Financial Group, and Trump Institute. ER0202-05(CR17-2:¶¶7-17).

## E.     The District Court's Ruling

Ruling on Makaeff's motion to strike, the district court found "Makaeff has satisfied her initial burden of making a prima facie showing the defamation claim

- 33 -

arose out of acts in furtherance of her rights of petition of free speech under subdivision 425.16(e)(4)." ER0009(CR24:6). It then turned to "whether Trump University can establish by a reasonable probability that it will succeed on the merits of its defamation claim," as required by §425.16(b)(1). ER0009(CR24:6). The district court ruled that it had.

"Because public figures must prove by clear and convincing evidence that the allegedly defamatory statement was made with actual malice," the district court observed, "the first issue is whether Trump University is a public figure." ER0009(CR24:6) (citing *New York Times*, 376 U.S. at 179-80; *Curtis Publ'g*, 388 U.S. at 133-34). The district court then held: "Trump University is not a public figure." ER0009(CR24:6). Though "Donald Trump is the Chairman of Trump University and featured prominently in its advertising," and "although Donald Trump may himself be an 'all purpose' public figure," the district court said it could not conclude "that association with an 'all purpose' public figure ***by itself*** confers public figure status." ER0009-10(CR24:7) (court's emphasis). "Trump University is a privately-held company with 39 employees," the district court explained, "which has not sought the public's attention other than in advertising its services." ER0010(CR24:7).

"Nor is Trump University a 'limited purpose' public figure," the district court then ruled, writing that even if "public controversy exists concerning Trump

- 34 -

University's alleged deceptive business practices, Trump University's involvement in this controversy was not voluntary," as "Trump University did not voluntarily inject itself into the controversy, or engage the public's attention in order to influence resolution of the controversy." ER0010(CR24:7). The district court held that, "as Trump University argues, aggressive advertising alone does not convert a company into a public figure." ER0010(CR24:7).

Noting that "'[s]tatements of opinion are not actionable,'" and that "[w]hether a statement is of fact or opinion must be determined in the context in which the statement is made," the district court concluded that of the 21 allegedly defamatory statements that Trump University had excised from Makaeff's two letters, five might qualify as provably false statements of fact:

> that Trump University engaged in (1) a "clear practice of personal financial information fraud," (2) "grand larceny," (3) "identity theft," (4) "unsolicited taking of personal credit and trickery into [sic] opening credit cards without approval," and (5) "blatant lies" when it represented that is provided "mentoring and coaching sessions."

ER0011-12(CR24:8-9). The district court then excused Trump University of the requirement that it show actual injury, explaining that charges of "crimes including 'grand larceny' and 'identity theft'" are "libelous per se," and therefore "are actionable without proof of special damages." ER0012(CR24:9). It further ruled that Michael Sexton's declaration satisfied Trump University's burden of making "a prima facie showing that the following statements are false: the company engages in (1) the

- 35 -

'unsolicited taking of personal credit and trickery into [sic] opening credit cards without approval,' (2) 'identity theft,' and (3) 'grand larceny.'" ER0012-13(CR24:9-10).

Trump University thus had, in the district court's view, carried its burden of demonstrating a probability that it will prevail with respect to those three statements. ER0012-13, 0015(CR24:9-10, 12).

Although Makaeff's letter to her bank had promised litigation if necessary, and although her communication with the BBB represented an attempt at mediation, the district court ruled that both fell outside California's privilege for pre-litigation communications, "because Makaeff was attempting to obtain a refund in order to avoid litigation." ER0014(CR24:11).

Thus, it concluded, "Trump University has made the requisite prima facie showing of facts which would, if credited, support a judgment in its favor" on its million-dollar counterclaim. ER0015(CR24:12).

## V.    SUMMARY OF ARGUMENT

Makaeff was entitled to protection of California's anti-SLAPP statute, and the district court erred in ruling that Trump University demonstrated the required "probability" that it "will prevail" on its counterclaim against Makaeff on the rationale that Trump University cannot be deemed a "public figure" required to prove actual

malice when it sues a former student for complaining about its purported educational program. *See infra* 38-63.

Trump University has in fact held itself out as a public figure both by calling itself a "University," and also by merging itself into the public persona of Donald Trump, one of the most prominent public figures of our time – a man who makes his own identity, as a practical matter, inseparable from that of his business empire, including his so-called "University." That "University" has traded on its identification with his public persona as it recruits students to spend tens of thousands of dollars hoping to learn Donald Trump's personal money-making "secrets." At the very least, Donald Trump's "University" must be deemed a limited-purpose public figure with respect to controversy surrounding its purported educational program and methods. *See infra* 40-63.

The district court erred as well by holding that a letter clearly stating Makaeff's intent to litigate, and her effort actually to seek mediation through the BBB, somehow fall outside California's litigation privilege, which covers pre-litigation communications and attempts to arbitrate or mediate disputes. *See infra* 63-67.

The district court further erred in holding that specific examples of supposedly "defamatory rhetoric," about "grand larceny," "identity theft," and even "brainwashing" sales tactics, would be understood by their readers – a bank's

consumer-credit dispute-resolution department and a BBB professional mediator – as

something other than a distraught consumer's rhetorical hyperbole. *See infra* 67-71.

Finally, the district court erred in holding that Trump University need not prove

actual injury from Makaeff's statements, which the court had already found clearly

related to matters of public concern. *See infra* 71-75.

## VI.    ARGUMENT

### A.    California's Anti-SLAPP Statute Protects Tarla Makaeff's Communications About Donald Trump's "University"

"California's Anti-SLAPP Law, Cal. Code Civ. P. §425.16, was passed in

January 1993 in response to the legislature's concern about civil actions aimed at

private citizens to deter or punish them for exercising their political or legal rights."[15]

In §425.16(a), California's Legislature directs that its provisions must be liberally

construed to protect the free speech of citizens like Tarla Makaeff.  Cal. Code Civ. P.

§425.16(a); *see Newsham*, 190 F.3d at 971 (quoting §425.16(a)).

Section 425.16 "unambiguously makes subject to a special motion to strike any

'cause of action against a person arising from any act of that person in furtherance of

the person's right of petition or free speech under the United States or California

---

[15]     *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 971 (9th Cir. 1999) ("*Newsham*"); *see generally Wilcox v. Superior Court*, 33 Cal. Rptr. 2d 446, 450 (Cal. App. 1994), *disapproved in part on other grounds*, *Equilon Enters.*, 52 P.3d at 694.

- 38 -

Constitution in connection with a public issue' as to which the plaintiff has not 'established that there is a probability that [he or she] will prevail on the claim.'"[16] "California law recognizes the protection of the anti-SLAPP statute as a substantive immunity from suit," which this Court applies to claims, and to counterclaims, filed in federal diversity proceedings.[17]

Section 425.16 required Trump University to "'make a prima facie showing of facts which would if proved at trial, support a judgment in [its] favor.'"[18] To the extent that Trump University may be deemed a "public figure," that showing must be sufficient to demonstrate *by clear and convincing evidence* that Makaeff acted with actual malice – with actual knowledge of falsity or reckless disregard.[19] "In making its determination the court shall consider the pleadings, and supporting and opposing

---

[16]    *Equilon Enters.*, 52 P.3d at 688 (quoting Cal. Code Civ. P. §425.16(b)(1)); *see Governor Gray Davis Com'm. v. Am. Taxpayers Alliance*, 125 Cal. Rptr. 2d 534, 539-40 (Cal. App. 2002).

[17]    *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003); *accord, e.g.*, *Liberal v. Estrada*, 632 F.3d 1064, 1088 (9th Cir. 2011) (quoting *Batzel*); *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1109 (9th Cir. 2003); *Newsham*, 190 F.3d at 970-73 (counterclaims).

[18]    *Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 760 (Cal. App. 2007) (quoting *Dowling v. Zimmerman*, 103 Cal. Rptr. 2d 174, 188 (Cal. App. 2007)); *accord Greka Integrated, Inc. v. Lowry*, 35 Cal. Rptr. 3d 684, 690-91 (Cal. App. 2005).

[19]    *Conroy v. Spitzer*, 83 Cal. Rptr. 2d 443, 447 (Cal. App. 1999); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986).

- 39 -

affidavits stating the facts upon which the liability or defense is based." Cal. Code Civ. P. §425.16(b)(2).

On the record in this case, it should be clear that Trump University's million-dollar counterclaim is one designed to intimidate and punish Makaeff. "'Intimidation will naturally exist any time a community member is sued by an organization for millions of dollars even if it is probable that the suit will be dismissed.'"[20] Trump University's million-dollar counterclaim had to be dismissed as a classic SLAPP suit, unless admissible evidence "established that there is a probability that [it] will prevail on the claim." Cal. Code Civ. P. §425.16(b)(1). As set forth below, the district court erred by holding that Trump University met this burden based on its holdings that Trump University was not required to prove actual malice, or even injury.

### B. Donald J. Trump and His "University" Are Public Figures for Purposes of the *New York Times v. Sullivan* Actual-Malice Test

The Supreme Court held in *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964), that the First Amendment requires a public official suing for defamation to prove each allegedly defamatory statement was made "with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or

---

[20] *Equilon Enters.*, 52 P.3d at 690 (quoting Comment, *Strategic Lawsuits Against Public Participation: An Analysis of the Solutions*, 27 Cal. Western L. Rev. 399, 405 (1991)).

not." This actual malice must be demonstrated with "convincing clarity." *Id*. at 285-86. Subsequent decisions extended the requirement to defamation actions brought by "public figures." In *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967), the Court held that a university athletic director was a "public figure," who, Justice Harlan emphasized, "may have attained that status by position alone," while another respondent in a related proceeding had done so by thrusting himself "into the 'vortex' of an important public controversy." *Id*. at 155.

"Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures," the Court later elaborated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), "may recover for injury to reputation only on ***clear and convincing proof*** that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Id*. at 342 (emphasis added). "Public officials ***and public figures***," the Court observed, "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id*. at 344 (emphasis added). Certainly that is true of both Donald Trump, and his "University."

Some public figures, like Donald Trump, "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," the Supreme Court held in *Gertz*, while others properly "classed as public figures have

- 41 -

thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." *Gertz*, 418 U.S. at 345; *see id*. at 351. Again, both Donald Trump and his "University" have sought to attract public attention, and invited public comment, concerning matters of great public interest.

That Donald Trump is a public figure Trump University has admitted: "We would readily concede that Donald Trump is a public figure." ER0178(CR30:21(12-13)) (hearing transcript). Makaeff submits that by trading upon its identification with Donald Trump and the Trump financial empire, Trump University shares with Donald Trump his status as an all-purpose public figure. But if it does not share that status, it is at least a limited-purpose public figure, that has inserted itself into the public controversies concerning its founder, chairman, and namesake, his ventures into private for-profit education, and appropriate responses to the mortgage-foreclosure crisis.

### 1. Trump University Assumed the Role of a Public Figure by Holding Forth as a "University"

Trump University volunteered itself for public comment as an all-purpose public figure by adopting the name "University," and pretending to be a noteworthy institution of higher learning. For colleges and universities have always been an outstanding part of America's public political, economic, and intellectual discourse, whose very *raison d'etre* includes facilitating informed debate that promotes the

- 42 -

common weal. As one New York court put it: "We cannot view such an institution of higher learning as other than a public figure for all purposes."[21]

School officials also have been held to be public figures themselves by virtue of their position at a college or university. The Supreme Court's seminal decision in *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967), wherein "a majority of the Court agreed . . . that the *New York Times* test should apply to criticism of 'public figures' as well as 'public officials,'" *Gertz*, 418 U.S. at 336, involved a university's athletic director – who was held to be a public figure himself simply by virtue of his association with the university. Justice Harlan's plurality opinion emphasized that a university official "may have attained that status by position alone," while the respondent in a related proceeding, a retired military officer, had done so by thrusting himself "into the 'vortex' of an important public controversy."[22]

---

[21] *Ithaca Coll. v. Yale Daily News Publ'g Co.*, 433 N.Y.S.2d 530, 534 (N.Y. App. Div. 1980), *aff'd*, 445 N.Y.S.2d 621 (N.Y. App. Div. 1981); *accord, e.g.*, *University of the South v. Berkley Publ'g Corp.*, 392 F. Supp. 32, 33 (S.D.N.Y. 1974) (a university is a public figure); *Long Island Univ. v. Grucci for Cong., Inc.*, 781 N.Y.S.2d 148, 149 (N.Y. App. Div. 2004) (same).

[22] *Curtis Publ'g*, 388 U.S. at 155 (plurality opinion of Justice Harlan joined by Justices Clark, Stewart and Fortas); *see also id*. at 162 (Chief Justice Warren, joined by Justices Brennan and White, noting that "seven members of the Court agree that the respondents in these cases are 'public figures' for First Amendment purposes").

- 43 -

In *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 499-500 (1991), a relatively obscure former university professor who became "projects director" of the quasi-academic Sigmund Freud Archives was deemed without contest to be a public figure, required to prove *New York Times* actual malice: "When, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, *i.e.*, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id*. at 510 (quoting *New York Times*, 376 U.S. at 279-80).

Many other decisions have held that college deans and professors are, by virtue of their positions, at least limited-purpose public figures within their academic communities and with respect to commentary by students and others connected to the school.[23] So must Trump University be deemed – at the very least – a limited-purpose public figure with respect to commentary by its own students, such as Tarla Makaeff.

But Trump University should be deemed more than that – an all-purpose public figure – because it holds itself forth as one, thereby inviting public comment. Donald

---

[23]  *See, e.g.*, *Johnson v. Bd. of Junior Coll. Dist. #508*, 334 N.E.2d 442, 447 (Ill. App. 1975) (community-college professors); *Walko v. Kean College*, 561 A.2d 680, 686 (N.J. Super. 1988) (instructor and Assistant to the Dean of the School of Education at Kean College); *Byers v. Southeastern Newspapers Corp.*, 288 S.E.2d 698, 701 (Ga. App. 1982) (college dean); *Gallman v. Carnes*, 497 S.W.2d 47, 50-51 (Ark. 1973) (law school professor and assistant dean); *Rose v. Koch*, 154 N.W.2d 409, 426 (Minn. 1967) (university professor).

Trump's "University" has, indeed, received extensive media attention as a consequence of holding itself out as a "University" – not all of it favorable.  The complaint cites several examples, including two of David Lazarus' *Los Angeles Times* columns, one describing Trump University's program, and the next recounting Donald Trump's threat to sue the columnist,[24] as well as Douglas Feiden's column in the *New York Daily News*, titled *State Educrats Give Failing Grade to Donald Trump's "Misleading" University*,[25] and Lynn O'Shaughnessy's April 19, 2010, piece for *CBS MoneyWatch*, titled *Is Trump University Flunking Out?*[26]

The *New York Daily News* reported in April 2010 that New York's Education Department had awarded a "failing grade to Donald Trump's 'misleading,' Trump University," with the government agency directly

> accusing the self-promoting mogul of "misleading" the public and breaking the law with his online business education firm – humbly called Trump University.

---

[24]    *See* ER0266(CR10:¶30).

[25]    ER0274(CR10:¶54 & n.9); RJN Ex. C.

[26]    ER0274(CR10:¶54 & n.9) (citing Lynn O'Shaughnessy, *Is Trump University Flunking Out?*, April 19, 2010 (online at http://moneywatch.bnet.com/spending/blog/college-solution/is-trump-university-flunking-out-1913/ (accessed May 25, 2011).  *See* RJN Ex. D.

- 45 -

In a strongly worded letter obtained by the Daily News, the state Education Department slammed the tycoon for calling the cyber-school a university and demanded he stop using the term.

\*    \*    \*

Adding to Trump's woes, the for-profit firm that promises to teach wanna-be billionaires the secrets of deal-making was hit with a D-minus rating by the Better Business Bureau in January.[27]

*CBS MoneyWatch* also found the University's conduct something of considerable public interest, warning that "The Better Business Bureau doesn't think much of Donald Trump's university.  Earlier this year the BBB gave Trump University a near failing grade of 'D-.'"[28]

Whether it is an all-purpose or limited-purpose public figure, Trump University should be required to show actual-malice before it may recover for students' statements about its purported educational program and methods.

---

[27]    *See* ER0274(CR10:¶54 & n.9) (citing and quoting Douglas Feiden, *State Educrats Give Failing Grade to Donald Trump's "Misleading" Trump University*, New York Daily News, April 16, 2010 (online at http://articles.nydailynews.com/2010-04-16/news/27061901_1_donald-trump-dunce-cap-trump-university (accessed May 25, 2011).  *See* RJN Ex. C.

[28]    Lynn O'Shaughnessy, *Is Trump University Flunking Out?*, *CBS MoneyWatch*, April 19, 2010 (online at http://moneywatch.bnet.com/saving-money/blog/college-solution/is-trump-university-flunking-out/1913/ (accessed May 25, 2011).  *See* RJN Ex. D.

- 46 -

### 2. Trump University Assumed the Role of a Public Figure by Thoroughly Identifying Itself with Donald J. Trump's Public Persona

Trump University has acknowledged that its founder, chairman, and chief spokesman, Donald J. Trump, is an all-purpose public figure: "We would readily concede that Donald Trump is a public figure." ER0178(CR30:21(13)) (hearing transcript). Trump University shares that status, by deliberately merging its own identity into Donald Trump's public persona.

The district court erred when it ruled otherwise, holding that "although Donald Trump himself may be an 'all purpose' public figure," Makaeff had not shown "that association with an 'all purpose public figure *by itself* confers public figure status," and crediting Trump University's assertions that it is "a privately-held company with 39 employees, which has not sought the public's attention other than in advertising its services." ER0010(CR24:7). Even if Trump University has thrust itself in the public eye, the district court held, "aggressive advertising alone does not convert a company into a public figure." ER0010(CR24:7) (citing *Vegod Corp. v. ABC*, 603 P.2d 14, 17-18 (Cal. 1979)).

This ruling wholly ignores *the character* of Trump University's publicity and advertisements, which featured Donald Trump speaking in the first person about what he can personally offer through his own so-called "University." Trump University's ads have employed Donald Trump's image, quoting him in the first-person voice:

- 47 -

"*I'm going to give you* 2 hours of access to one of *my* amazing instructors AND priceless information . . . ." ER0266(CR10:¶30) (emphasis added). Not only have Trump University's ads told readers that they can "Learn from the Master," the iconic Donald J. Trump, those ads have featured photographic images of Mr. Trump declaring, in the first-person, that through Trump University "I can turn anyone into a successful real estate investor":



ER0266(CR10:¶30).

- 48 -

"Join Trump University," other ads have urged, while picturing Donald Trump, and promising: "It's the next best thing to being his Apprentice":



ER0266(CR10:¶30)

Another ad, styled as "A Private, Limited-Time Only Invitation from Trump University," promised those receiving it that they could be privy to "Insider Success Secrets from Donald Trump":



ER0266(CR10:¶30).

As described in the complaint, scripted presentations at Trump University's programs similarly merge Donald Trump's persona and the identity of his "University":



ER0267-68(CR10:¶33).

Press coverage also has treated Trump University as an extension of Donald Trump's public persona.  David Lazarus's column, *Trump Spins in Foreclosure Game*, told readers of the December 12, 2007, *Los Angeles Times* that:

> An ad in this very newspaper showed a picture of The Donald and quoted him as saying, "Investors nationwide are making millions in foreclosures . . . and so can you!

"I'm going to give you 2 hours of access to one of my amazing instructors AND priceless information . . . all for FREE."

OK, I know what you're thinking. You're thinking there has to be a catch, such as the fact that the ad doesn't mention anywhere that the free two-hour seminar is only a "preview" of the three-day workshops that Trump offers for $1,495.

\* \* \*

Trump wouldn't be at the Pasadena seminar, but I reached the Big Man by phone . . . .

"I love teaching," he told me. "I love helping people."[29]

The next week, on December 16, 2007, Mr. Lazarus's readers enjoyed a follow-up column, titled *Trump's a Grump about Column on his "Priceless" Tips*, reporting that Mr. Trump had taken criticism of his "University" program very personally. The columnist recounted:

Donald Trump wasn't happy with Wednesday's column about his seminars on profiting from the foreclosure market.

I know this because I was instructed by his executive assistant to give Trump a call after the column ran, and when Trump came on the line, he told me that my work was "inaccurate and libelous."

I asked what specifically was the problem.

---

[29]   David Lazarus, *Trump Spins in Foreclosure Game*, Los Angles Times, Dec. 12, 2007       (online       at       http://www.latimes.com/business/la-fi-lazarus12dec12,0,7835610.column (accessed May 25, 2011)).  *See* RJN Ex. A.

"You'll find out in court," Trump replied, adding that he was going to sue my derriere off. Actually, he used a three-letter word that wasn't French.[30]

Consumers like Makaeff might have taken this as a warning that they too could be sued if they dared complain about the "education" received from Donald Trump's purported institution of higher learning. Perhaps some did, choosing not to speak about their experience with Donald Trump's "University." Such threats of litigation, calculated to chill public discussions, are why §425.16 was enacted.

Public-figure status properly extends to a corporate entity, such as Trump University, that is inextricably intertwined or associated with an individual such as Donald Trump. Fletcher's *Cyclopedia* on corporate law observes that "where a corporate officer and the corporation are inextricably interwound by name and corporate structure, if one is deemed a public figure, so must the other." 9 *Fletcher's Cyclopedia of the Law of Corporations* §4255.50 (2010) (emphasis added). Thus, when the Schiavone Construction Company sued *Time Magazine* for suggesting that it was linked to organized crime, Ronald Schiavone and Schiavone Construction Company were found so "inextricably intertwined by name and corporate structure"

---

[30]     David Lazarus, *Trump's a Grump About Column on His "Priceless" Tips*, Los Angeles Times, Dec. 16, 2007 (online at http://www.latimes.com/business/la-fi-lazarus16dec16,0,1670633.column (accessed May 25, 2011). *See* RJN Ex. B.

- 53 -

that "if one is deemed a public figure so must the other be."[31]  And in *Hentzen Contractors, Inc. v. Wichita*,[32] when a construction company bore the name of a local public figure, "Bud Hentzen's status as a public figure was properly imputed to Hentzen Contractors," for readers "would conclude the two are 'inextricably intertwined by name and corporate structure.'"

Here, of course, Trump University and Donald Trump are "inextricably intertwined."  Donald Trump's public-figure status may properly be imputed to his namesake, Trump University where, as here, Trump University advertises that its programs are "the next best thing to being [Donald Trump's] Apprentice," tells consumers that they can learn "insider success secrets from Donald Trump," and promises a "power team" of instructors and mentors "hand-picked by Trump." ER0266, ER0268-69(CR10:¶¶30, 36-37).

---

[31]     *Schiavone Const. Co. v. Time, Inc.*, 619 F. Supp. 684, 705 n.13 (D.N.J. 1985), *aff'd in part, and rev'd in part on other grounds*, 847 F.2d 1069 (3d Cir. 1988).

[32]     814 P.2d 42, 1991 Kan. App. LEXIS 510, at *16 (Kan. App. 1991).  Kansas court rules permit citation of unpublished Kansas appellate decisions "if they have persuasive value with respect to material issue not addressed in a published opinion of a Kansas appellate court."  Kan. Sup. Ct. Rule 7.04(f)(2)(ii).

### 3. Trump University Is, at the Very Least, a Limited-Purpose Public Figure

If Donald Trump's purported "University" is not a public figure for all purposes, it is at least a limited-purpose public figure, for it has inserted itself in the public controversies that surround Donald Trump and his ventures, as well as those surrounding for-profit educational institutions and appropriate responses to the mortgage-foreclosure crisis.

According to the district court, "even assuming a public controversy exists concerning Trump University's alleged deceptive business practices, Trump University's involvement in this controversy was not voluntary," as "Trump University did not inject itself into the controversy, or engage the public's attention in order to influence resolution of the controversy." ER0010(CR24:7). Yet Trump University surely *did* venture to insert itself in public controversy – by choosing to call itself a "University," by identifying itself with the public persona of one of the most controversial figures of our time, and by inserting itself into the center both of the economic and public-policy controversy swirling around the mortgage-foreclosure crisis, as well as the growing controversy surrounding for-profit educational institutions.

The district court nonetheless cited *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167 (1979), as holding an individual is "not a public figure where he was dragged unwillingly into the controversy, never discussed the matter with the press, and did

- 55 -

not voluntarily inject himself into the controversy," and it cited *Time, Inc. v. Firestone*, 424 U.S. 448 (1976), as holding that "the actions of a prominent citizen in filing for divorce and during divorce proceedings . . . were not 'voluntary' so as to make her a public figure." ER0010(CR24:7).

It is, however, hard to fathom how Donald Trump's "University" might be deemed in any respect analogous to the private individuals who shrank from publicity in either *Wolston*, where a book falsely charged that a thoroughly private free-lance translator had been convicted of espionage decades before, or *Firestone*, where a national magazine falsely reported that a former Palm Beach schoolteacher, engaged in a personal domestic dispute with her wealthy husband, had been found guilty of adulterous acts so outrageous as "to make Dr. Freud's hair curl." *Firestone*, 424 U.S. at 452. Each case involved a private human being who had sought no publicity.

Trump University, on the other hand, has deliberately called attention to itself as a "University," adopting Donald Trump's name, and advertising with his image and first-person promises – precisely because it desires to garner public attention to itself and its "priceless" program imparting "[i]nsider success secrets from Donald Trump." It has sought to identify its program with Donald Trump in his capacity as an ostentatious public figure, deliberately blurring any line in the public mind between Donald Trump himself, and Trump University as an independent entity.

- 56 -

The district court nonetheless wrote that Trump University is merely "a privately-held company with 39 employees," ER0010(CR24:7), apparently relying on its President Michael Sexton's declaration describing Donald Trump's "University" as "a small private company with 39 employees," that he said also "currently utilizes 35 independent contractors." ER0212-13(CR15-1:¶2). Yet Sexton said nothing about how Trump University or its contractors, one of which perhaps employed waterboarding to incentivize sales reps pushing Trump University classes, have actually portrayed the "University."[33] The impression conveyed by Michael Sexton's declaration and adopted by the district court – of a tiny outfit, independent of Donald Trump, with a handful of employees, and no public profile – is entirely at odds with the public image that Donald Trump, his "University," and its contractors have together cultivated.

---

[33] *See* Karl Vick, *Team Building or Torture?  Court Will Decide*, Washington Post, April 13, 2008, ("No one really disputes that Chad Hudgens was waterboarded . . . . The morning Hudgens said he thought he was going to drown, his team was calling on behalf of 'Trump University,' pitching real estate instruction to people to had attended a Trump seminar.") (online at http://www.washingtonpost.com/wp-dyn/content/article/2008/04/12/AR2008041201739_pf.html) (accessed May 25, 2011) (RJN Ex. E); *see also Hudgens v. Prosper, Inc.*, 243 P.3d 1275, 1277 & n.2 (Utah 2010) (recounting the victim's tale: "After concluding the [waterboarding] exercise, Mr. Christopherson instructed his team members that they should work as hard at making sales as Mr. Hudgens had worked at trying to breathe."). One need not credit the waterboarding allegation to recognize that Sexton's declaration says nothing about how either its employees or its contractors have portrayed the "University."

The presentation used at Trump University's seminars certainly depicted the "University" as part of something grand:



ER0267(CR10:¶32).

The district court erred, moreover, by brushing Trump University's advertising aside under the California Supreme Court's statement in *Vegod Corp.*, 603 P.2d at 18, that "[c]riticism of commercial conduct does not deserve the special protection of the actual malice test," and that "a person in the business world advertising his wares does not necessarily become part of an existing public controversy." *See* ER0011(CR24:8). "To the extent that this language can be read as insulating all advertising and pro-

- 58 -

business promotional efforts from public controversy," the First Circuit observed in *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 590 (1st Cir. 1980), "it is probably overbroad."

*Vegod* need not be construed and applied so broadly. The plaintiff companies in *Vegod* had merely advertised that they were liquidating the goods of a landmark store gone bankrupt. Even if that store's bankruptcy was a matter of public controversy, California's Supreme Court held that "those conducting the subsequent closeout sale cannot be said to have thrown themselves into the vortex of that controversy." *Vegod*, 603 P.2d at 17. "Merely doing business with parties to a public controversy does not elevate one to public figure status." *Id*.

This case is entirely different. Trump University is not engaged in "commercial conduct" as a mere vendor "advertising his wares." *Vegod*, 603 P.2d at 18. It has held itself out as an educational institution – indeed, a "University" – offering educational opportunities direct from Donald Trump, himself a controversial public figure. *Vegod's* holding that a mere vendor "advertising his wares does ***not necessarily*** become part of an existing public controversy" (603 P.2d at 18), has little relevance here, where Donald Trump and his University themselves created controversy that "preceded the alleged defamation." *Bruno*, 633 F.2d at 591.

Moreover, advertising clearly ***can*** turn a business into a public figure. In *Steaks Unlimited v. Deaner*, 623 F.2d 264 (3d Cir. 1980), a meat retailer sued a consumer-

- 59 -

interest reporter and television station for reporting that it misrepresented the quality of its beef. *Id.* at 274. The Third Circuit held that with its retail advertising campaign, Steaks Unlimited "voluntarily injected itself into a matter of public interest," and had thereby "created a controversy for the purposes of influencing the consuming public." *Id.* While Steaks Unlimited claimed that its beef was from "'mature, grass-fed'" cattle and was a "'fantastic bargain at $21.75 per pack,'" consumers complained that the beef was of poor quality, and little cheaper than that selling in local markets. *Id.* at 268. The Third Circuit held that "through its advertising blitz, Steaks invited public attention, comment and criticism," and therefore "created the controversy on which Steaks' status as a public figure is premised." *Id.* at 274 n.45.

Similarly, in *Sunshine Sportswear & Electronics, Inc. v. WSOC Television*, 738 F. Supp. 1499 (D.S.C. 1989), an electronics store was a limited-purpose public figure when the BBB and others charged it with false and misleading advertising, deceptive business practices, a bait-and-switch, calling it a "scam" and "rip off." *Id.* at 1506. "Through their extensive advertising," the business and its president "engaged the public's attention and therefore, assumed the accompanying risk" of public comment, thereby making themselves "public figures with regard to the controversy."[34]

---

[34]     *Id.* at 1507; *accord, e.g.*, *Izusu Motors Ltd. v. Consumers Union of the United States, Inc.*, 66 F. Supp. 2d 1117, 1124 (C.D. Cal. 1999) ("Isuzu can be considered a public figure to the extent that it . . . through its marketing and advertising, has made

Trump University must, at a minimum, be deemed a limited-purpose public figure with respect to students' commentary on its practices.

### 4. Additional Judicially Noticeable Materials Confirm that Trump University Is a Public Figure

Many books, newspapers articles, and magazine articles beyond those referenced before the district court confirm what already should be obvious – that Trump University held itself out as an all-purpose public figure by identifying itself as a "University," that it operated as an extension of Donald Trump's flamboyant public persona, and that it deliberately inserted itself in matters of public controversy.

Ongoing press coverage *continues* to demonstrate that Trump University is viewed as an extension of Donald Trump's controversial public persona. Even as this brief is being written, articles appear daily discussing Trump University's program and what it says about Donald Trump's character. A few examples are attached as Exhibits to the Request for Judicial Notice accompanying this brief. *See* RJN Exs. F-T.

---

claims about the safety and performance of the Trooper."); *Brueggemeyer v. ABC*, 684 F. Supp. 452, 458 (N.D. Tex. 1988) (bulk-meat seller a public figure as to reports that it engaged in deceptive advertising); *American Future Sys., Inc. v. BBB*, 923 A.2d 389, 390 (Pa. 2007) (telemarketer publishing newsletters for "career-oriented individuals" a limited-purpose public figure); *see also* Robert D. Sack, *Sack on Defamation: Libel, Slander and Related Problems* §5:3.5 (4th ed. 2010) ("someone doing business in the marketplace should be considered 'public' to that extent for purposes of comment about that activity").

- 61 -

This Court also is entitled to judicially notice Donald Trump's books, including his "collaborations" with Trump University – several of them depicted in the complaint, *see* ER0267-68(CR10:¶33) – which similarly demonstrate that Trump University is an extension of Donald Trump's public persona. *See* RJN Exs. U-Y.

In the 2007 book *Trump 101: The Way to Success*, for example, Donald Trump declares: "I created Trump University because I want to impart the business knowledge that I've accumulated over the years. It's my way of stressing how important I feel it is to obtain knowledge. At Trump University, you get information in a practical, convenient setting that teaches success."[35] And in his 2008 book *Trump: Never Give Up*, which he characterizes as a further "collaboration" with the "Trump University team," Donald Trump declares: "Ignorance is more expensive than education, and considering what's available these days – Trump University, for example – very few people can make a strong case for ignorance."[36] Donald Trump's book carries an ad for his purported institution of higher learning, which declares:

> Donald J. Trump knows about success. He lives it. He epitomizes it. And now he's ready to ***teach*** it – with world-class instructors, convenient online learning programs, and a wealth of streetwise wealth-

---

[35] Donald J. Trump with Meredith McIver, *Trump 101: The Way to Success* 30 (2007). *See* RJN Ex. U.

[36] Donald J. Trump with Meredith McIver, *Trump: Never Give Up: How I Turned My Biggest Challenges into Success xiii*, 143 (2008). *See* RJN Ex. W.

building wisdom that can give you a lifelong professional and personal advantage.

Visit our website today – www.TrumpUniversity.com to learn more, do more, and BE more. The information is absolutely free – but the opportunity could be priceless.[37]

Trump University clearly is an extension of Donald Trump's public persona that has voluntarily thrust itself into controversy and shares his status as a public figure.

### C. The District Court Erred by Holding Makaeff's Statements Fall Outside California's Privilege for Pre-Litigation Communications

Makaeff's statements also are privileged as communications made in connection with anticipated litigation. Makaeff's letter to her bank emphasized that she was "willing to go to whatever lengths necessary to obtain my money back including taking legal action," ER0223(CR15-1/Ex.A:11), referenced "discussions with counsel" from which she concluded that she indeed had "legal cause for action," ER0227(CR15-1/Ex.A:15), and noted even that Trump University students were "discussing class action" litigation as the best device for seeking justice. ER0231(CR15-1/Ex.A:19). Her complaint to the BBB, conveyed to Trump University *by a mediator*, can only be regarded as an attempt to reach a mediated

---

[37]    *Id*., back matter (book's emphasis).

resolution of a dispute that was headed for court. *See* ER0239(CR15-1/Ex.A:26). Thus, even if Makaeff's statements might otherwise be found defamatory, the litigation privilege provides an absolute bar to liability.[38]

The district court ruled the privilege inapplicable absent a "showing that at the time Makaeff made these statements, litigation was 'no longer a mere possibility, but had instead implied into a ***proposed proceeding***." ER0014(CR24:11) (quoting *Edwards v. Centex Real Estate Corp.*, 61 Cal. Rtpr. 2d 518, 533 (Cal. App. 1997) (appellate court's emphasis)). It held "the evidence shows litigation was only a possibility at that time, because Makaeff was attempting in [sic] obtain a refund in order to avoid litigation." ER0014(CR24:11).

The district court's reliance on *Edwards* was misplaced, for in that case "[t]here was no threat or suggestion of a lawsuit," let alone evidence that proponents of the privilege "***themselves*** actually contemplated litigation, seriously and in good faith." *Edwards*, 61 Cal. Rptr. 2d at 532, 533 (court's emphasis). Here, Makaeff's letters clearly indicated that she would seek legal redress in "a ***proposed proceeding*** that is actually contemplated in good faith and under serious consideration as a means of

---

[38]    *See* Cal. Civ. Code §47(b); *Rubin v. Green*, 847 P.2d 1044, 1046-47 (Cal. 1993); *American Prods., Inc. v. Law Offices of Geller, Stewart & Foley, LLP*, 37 Cal. Rptr. 3d 93, 98-99 (Cal. App. 2005); *Blanchard v. DIRECTV, Inc.*, 20 Cal. Rptr. 3d 385, 396 (Cal. App. 2004); *Sengchanthalangsy v. Accelerated Recovery Specialists, Inc.*, 473 F. Supp. 2d 1083, 1088 (S.D. Cal. 2007).

- 64 -

obtaining access to the courts for the purpose of resolving the dispute." *Id.* at 533 (court's emphasis). She wrote that her plans included "taking legal action" after "discussions with counsel" convinced her that she had "legal cause for action." ER0223, ER0227(CR15-1/Ex.A:11, 15).

That Makaeff sought assistance from the BBB to mediate the dispute ought not be held against her. As free communication may be critical to the resolution of disputes, California "courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial, legislative and other official proceedings." *Silberg v. Anderson*, 786 P.2d 365, 370 (Cal. 1990). It thus applies not just to formal litigation, but also to statements relating to efforts to resolve disputes through arbitration and mediation.[39]

Controlling California precedent holds that the litigation privilege of §47(b) applies ***to pre-suit*** communications. In *Rubin*, 847 P.2d 1044, 1048 (Cal. 1993), California's Supreme Court held it too "late in the day to contend that communications with 'some relation' to an anticipated lawsuit are not within the

---

[39] *See Hagberg v. Cal. Fed. Bank*, 81 P.3d 244, 254-55 (Cal. 2004) (private arbitration); *Moore v. Conliffe*, 871 P.2d 204, 212-13 (Cal. 1994) (private arbitration); *Komarova v. Nat'l Credit Acceptance*, 95 Cal. Rptr. 3d 880, 888 (Cal. App. 2009) (private arbitration); *Howard v. Drapkin*, 271 Cal. Rptr. 3d 893, 894 (Cal. App. 1990) (mediation).

- 65 -

privilege," noting that "numerous decisions have applied the privilege to prelitigation communications." It cited with approval decisions holding that the "privilege applies to communications with 'some relation to a proceeding that is actually contemplated in good faith and under serious consideration,'"[40] and holding that it covers both "'potential court actions,'"[41] and "'preliminary conversations and interviews' related to contemplated action."[42]

"For well over a century, communications with 'some relation' to judicial proceedings have been absolutely immune from tort liability by the privilege codified as section 47(b)." *Rubin*, 847 P.2d at 1047. Indeed, the privilege was derived "from common law principles establishing a defense to the tort of defamation." *Rusheen v. Cohen*, 128 P.3d 713, 718 (Cal. 2006). To be protected, the communication need only have "some connection or logical relation to the action." *Silberg*, 786 P.2d at 369. The privilege "should be denied only where [the communication] is so palpably irrelevant to the subject matter of the action that no reasonable person can doubt its

---

[40]    *Id.*, 4 Cal. 4th at 1194-95 (quoting *Block v. Sacramento Clinical Labs Inc.*, 182 Cal. Rptr. 438, 442 (Cal. App. 1982)).

[41]    *Id.* (quoting *Rosenthal v. Irell & Manella*, 185 Cal. Rptr. 92, 95 (Cal. App. 1982)).

[42]    *Id.* (quoting *Ascherman v. Natanson*, 100 Cal. Rptr. 656, 659 (Cal. App. 1972)).

irrelevancy." *Sacramento Brewing Co. v. Desmond, Miller & Desmond*, 89 Cal. Rptr. 2d 760, 766 (Cal. App. 1999).

Makaeff's statements easily meet the "some relation" requirement because they are directly related to the primary issue in this class action lawsuit – whether Trump University engaged in misrepresentations, deceptive practices and wrongful conduct. *See Feldman v. 1100 Park Lane Assocs.*, 74 Cal. Rptr. 3d 1, 23 (Cal. App. 2008) (statements made prior to litigation concerning the threat of legal action and the alleged basis for the threatened legal action were protected by the litigation privilege and did not constitute defamation).

### D. Trump University Failed to Demonstrate Makaeff's Complaints Are Actionable Statements of Fact Rather than Rhetorical Expressions of Opinion

The district court erred for the further reason that the statements it found potentially actionable, when read ***in context***, amount to rhetorical expressions of opinion.

"Under California law, recovery for defamation may be had only for false statements of fact. Statements of opinion are not actionable."[43]  Moreover,

---

[43]     *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 783 (9th Cir. 1980); *see Baker v. Los Angeles Herald Examiner*, 721 P.2d 87, 90 (Cal. 1986); *Campanelli v. Regents of the Univ. of Cal.*, 51 Cal. Rptr. 2d, 891, 894-95 (Cal. App. 1996); *McGarry v. Univ. of San Diego*, 64 Cal. Rptr. 3d 467 (Cal. App. 2007).

- 67 -

"[a]lthough defamation is primarily governed by state law, the First Amendment safeguards from freedom of speech . . . limit state law," protecting any "statements of opinion on matters of public concern that do not imply a provable factual assertion." *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).

"Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their position by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." *Gregory v. McDonnell Douglas Corp.*, 552 P.2d 425, 428 (Cal. 1976).

Makaeff's statements cannot be evaluated in isolation, as they are presented in Trump University's Counterclaim. *See* ER0311-12(CR4:¶¶22-23). What in isolation looks like statements of "fact," in context may be a layperson's rhetorical hyperbole, insufficient to support claims of defamation. Thus, in *Underwager*, this Court held that a charge that an expert witness was "lying" really amounted to "no more than nonactionable 'rhetorical hyperbole, a vigorous epithet used by those who considered his position extremely unreasonable.'" 69 F.3d at 367 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990) (quoting *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970))).

To evaluate Makaeff's "defamatory rhetoric," a court must "examine the totality of the circumstances in which the statement was made," looking first "at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work." *Underwager*, 69 F.3d at 366. The court must then "turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language and the reasonable expectations of the audience in that particular situation." *Id*. Only then may the court "inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false." *Id*.

The district court acknowledged that "whether a statement is of fact or opinion must be determined by the context in which the statement is made," ER0011(CR24:8) (citing *Info. Control*, 611 F.2d at 784), and observed that of the 21 defamatory statements alleged some clearly constitute "nonactionable opinions, hyperbole and rhetoric." ER0011(CR24:8). Yet it concluded that Trump University had shown five statements are potentially actionable statements of fact, namely, "that Trump University engaged in (1) a 'clear practice of personal financial information fraud,' (2) 'grand larceny,' (3) 'identity theft,' (4) unsolicited taking of personal credit and trickery into [sic] opening credit cards without approval,' and (5) 'blatant lies' when it represented that it provided 'mentoring and coaching sessions.'" ER0011-12(CR24:8-9). "At a minimum," the district court then held "Trump University has made a *prima*

- 69 -

*facie* showing that the following statements are false: the company engages in (1) the 'unsolicited taking of personal credit and trickery into [sic] opening credit cards without approval,' (2) 'identity theft,' and (3) 'grand larceny.'" ER0012-13(CR24:9-10).

The district court overlooked the context in which these specific statements were made: a layperson's emotional letters to her bank and the BBB, complaining that she had been bamboozled by Trump University and Profit Publishing. It is readily apparent that Makaeff was not trained in the law, and that she did not employ terms such as "grand larceny" and "identity theft" as they might be defined in legal usage. A consumer might say she was "robbed" without understanding that the term implicates violence, or threat of violence. Under the circumstances, Makaeff's use of such terms is no more actionable than the charge of "blackmail" in *Greenbelt*, 398 U.S. at 13-14, or that an expert witness was "lying" in *Underwager*, 69 F.3d at 367.

Makaeff's allusions to "personal financial information fraud" and an "unsolicited taking of personal credit and trickery into [sic] opening credit cards without approval" must be understood in light of the underlying facts that she described – "high pressure closing tactics, demanding students raise credit limits and enroll for new credit cards for 'real estate' transactions," when the real objective is to enter charges for further Trump University. ER0227(CR15-1/Ex.A:15). Considered

- 70 -

in context these are expressions amounting not to actionable statements of fact, but to rhetoric and opinion.

### E. The District Court Erred by Holding that Trump University Need Not Demonstrate Actual Injury

Finally, if the district court were right that Trump University is not a public figure required to demonstrate that Makaeff acted with actual malice, it still was required to demonstrate a likelihood that it suffered real economic damages: "It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury." *Gertz*, 418 U.S. at 349. "In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated in *New York Times* may recover only such damages as are sufficient to compensate him for actual injury." *Id*. at 350; *see Brown v. Memphis Publ'g Co.*, 538 F.2d 699, 703 (5th Cir. 1976) (*Gertz* "requires a showing of actual, not presumed damages.").

A subsequent concurring opinion in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 763 (1985) (Powell J., Joined by Rehnquist & O'Conner, JJ.), suggests that presumed damages may remain available absent proof of actual malice when the defamation plaintiff is a private figure, but only "when the defamatory statements do not involve matters of public concern." If the speech

involves a matter of public concern, however, even a private-figure defamation plaintiff must prove *New York Times'* actual malice to recover presumed damages.[44]

Here, the district court had already found that Makaeff's communications related to a matter of public interest. *See* ER0007-08(CR24:4-5). It thus erred by allowing damages to be ***presumed*** on the rationale that charges of "grand larceny" and "identity theft" are "libelous per se," and thus "actionable without proof of special damages." ER0012(CR24:9).

Trump University could not in fact even begin to demonstrate actual injury from Makaeff's letters to her bank and the BBB. Each institution, well accustomed to dealing with upset consumers' complaints, apparently forwarded Makaeff's concerns to Trump University – so that it could respond to them. Trump University submitted nothing to suggest that either the bank, or the BBB, was actually misled by anything in Makaeff's missives.

Trump University made no showing at all that Makaeff's letter to her bank had caused it actual injury. Trump University cannot even assert that the bank reversed any charges on account of Makaeff's letter. Nor can it seriously contend that Makaeff single-handedly induced the BBB to give Trump University a "D-" rating.

---

[44] *Id.*; *see Brown v. Kelly Broad. Co.*, 771 P.2d 406, 428-29 (Cal. 1989); *Melaleuca, Inc. v. Clark*, 78 Cal. Rptr. 2d 627, 636, 638 (Cal. App. 1998).

"As a result of Makaeff's defamatory statements," Trump University's President Michael Sexton nonetheless said in a declaration,

> Trump University's business has been adversely affected. Beginning in September of 2009, Trump University's business began a sharp and sustained decline in both revenue and overall profitability. Monthly revenues declined more than 30% beginning after September 2009.

ER0217(CR15-1:¶21). But neither Sexton, nor Trump University, could connect either Makaeff's September 2009 letter to her bank, or her November 2009 complaint to the BBB, to a precipitous drop in revenues supposedly beginning in September 2009. The bank and BBB both forwarded Makaeff's complaints to Trump University, which first made them public by filing them as exhibits to Sexton's declaration on July 19, 2010, ten months *after* the claimed (but undocumented) precipitous decline in Trump University's revenues. *See* ER0220-36(CR15-1/Ex.A:8-24); ER0238-45(CR15-1/Ex.A:26-32). Trump University failed to demonstrate any correlation between Makaeff's letters and its claimed loss of business beginning in September 2009. *Cf. Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1270-71 (C.D. Cal. 2001).

In fact, Sexton admitted that it was not Makaeff's letters, but rather Internet postings – by *many* disappointed Trump University students – to which negative financial consequences might be attributed. "In weekly conversations with members of the field team," Sexton stated, "the constant feedback has been that negative

- 73 -

comments on the internet by Ms. Makaeff *and others* have been the key driver of this decline. Attendees and prospective attendees have specifically cited those statements." ER0217(CR15-1:¶21) (emphasis added). Yet Makaeff cannot be liable for the "negative comments on the internet by . . . others." ER0217(CR15-1:¶21). That *many* negative comments have been made by *many* others is a given. The complaint cites or quotes just a few of them, some posted online as early as August 2007. ER0274(CR10:¶53). Trump University failed to identify *even one* posting by Makaeff that might have materially altered the general tenor of the increasingly negative online chatter about Trump University.

Nor is the vague hearsay to which Sexton alludes admissible evidence, let alone evidence sufficient to demonstrate that Trump University likely suffered actual injury from anything Makaeff said or did. "In opposing an anti-SLAPP motion, 'declarations that lack foundation, or are argumentative, speculative, impermissible opinion, hearsay, or conclusory are to be disregarded.'"[45] As such, Trump University failed to provide evidence of actual injury, and the district court erred by ruling that it satisfied its burden of demonstrating a probability of success on its defamation claim.

---

[45]    *Albergo v. Immunosyn Corp.*, No. 09cv2653 DMS(AJB), 2011 U.S. Dist. LEXIS 5455, at *11 (S.D. Cal. Jan. 20, 2011) (quoting *Gilbert*, 53 Cal. Rptr. at 752); *see* Fed. R. Evid. 802 (hearsay generally not admissible); *Arata v. City of Seattle*, No. C10-1551RSL, 2011 U.S. Dist. LEXIS 9870, at *5-*6 (W.D. Wash. Jan. 25, 2011) (hearsay declaration disregarded in SLAPP suit).

- 74 -

## VII.  CONCLUSION

The judgment below must be reversed, and the matter remanded with instructions to strike Trump University's counterclaim for defamation.

DATED:  May 26, 2011                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
ERIC ALAN ISAACSON
RACHEL L. JENSEN
AMANDA M. FRAME


                                          s/ Eric Alan Isaacson
                              _____
                                  ERIC ALAN ISAACSON

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES & HAEGGQUIST, LLP
AMBER L. ECK


                                          s/ Amber L. Eck
                              _____
                                      AMBER L. ECK

625 Broadway, Suite 906
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiff-Counter-Defendant-Appellant

- 75 -

## NINTH CIRCUIT RULE 28-2.6
## STATEMENT OF RELATED CASE

Plaintiff-Counter-Defendant-Appellant Tarla Makaeff is aware of no case currently pending in this Court that may be deemed a "related case" under this Court's Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certified that Plaintiff-Counter-Defendant-Appellant's Opening Brief uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 13,982 words according to the word count provided by Microsoft Word 2003 word processing software.

s/ Eric Alan Isaacson
_____
ERIC ALAN ISAACSON

<u>DECLARATION OF SERVICE</u>

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     I hereby certify that on May 26, 2011, I electronically filed the foregoing document: **PLAINTIFF-COUNTER-DEFENDANT-APPELLANT'S OPENING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

3.     I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2011, at San Diego, California.

s/ Eric Alan Isaacson
ERIC ALAN ISAACSON

26980_1

Service List
United States District Court for the Southern District of California, No. 10-cv-00940-IEG-WVG;
U.S. Court of Appeals for the Ninth Circuit, No. 11-55016

|  | ECF Filing Status |
|---|---|
| Amanda M. Frame<br>Robbins Geller Rudman & Dowd LLP<br>Suite 1900<br>655 West Broadway<br>San Diego, CA 92101-8498<br>aframe@rgrdlaw.com<br>Phone: 619/231/1058<br>619-231-7423 (fax) | Active |
| Amber Eck<br>Zeldes & Haeggquist, LLP<br>625 Broadway<br>Suite 906<br>San Diego, CA 92101<br>Ambere@zhlaw.com<br>Telephone: 619/342-8000<br>619/342-7878 (fax) | Active |
| David Keith Schneider<br>YUNKER & SCHNEIDER<br>Suite 1400<br>655 W Broadway<br>San Diego, CA 92101<br>dks@yslaw.com<br>Telephone: 619/233-5500<br>619/233-5535 (fax) | Active |
| Eric Alan Isaacson<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>Suite 1900<br>655 West Broadway<br>San Diego, CA 92101-8498<br>erici@rgrdlaw.com<br>Phone: 619/231/1058<br>619-231-7423 (fax) | Active |
| Rachel L. Jensen<br>Robbins Geller Rudman & Dowd LLP<br>Suite 1900<br>655 West Broadway<br>San Diego, CA 92101-8498<br>rachelj@rgrdlaw.com<br>Phone: 619/231/1058<br>619-231-7423 (fax) | Active |