No. 11-55016

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**Tarla Makaeff,** Individually and on Behalf of All Others Similarly Situated,
Plaintiff-Counter-Defendant-Appellant

v.

**Trump University, LLC**
Defendant-Counter-Claimant-Appellee

**On Appeal from the United States District Court**
**Southern District of California**
**The Honorable Irma E. Gonzalez**
**District Court Case No. 3:10-cv-00940-IEG(WVG)**

**BRIEF *AMICUS CURIAE* OF**
**AMERICAN CIVIL LIBERTIES UNION OF**
**SAN DIEGO & IMPERIAL COUNTIES**
**IN SUPPORT OF PLAINTIFF-COUNTER-DEFENDANT-APPELLANT**
**AND REVERSAL OF ORDER**

DAVID BLAIR-LOY
ACLU Foundation of San Diego & Imperial Counties
P.O. Box 87131
San Diego, CA  92138-7131
(619) 232-2121

Attorney for *Amicus Curiae*

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES……………………………………………...iii

CORPORATE DISCLOSURE STATEMENT………………………….....v

INTRODUCTION……………………………………………………….1

INTEREST OF AMICUS CURIAE……………………………………..1

ARGUMENT…………………………………………………………….2

     I.     THE FIRST AMENDMENT EQUATES PUBLIC FIGURES WITH
           PUBLIC OFFICIALS IN REQUIRING THEM TO PROVE
           ACTUAL MALICE BY CLEAR AND CONVINCING
           EVIDENCE…………………………………………….……2

     II.    CORPORATIONS  CANNOT EVADE THE FIRST AMENDMENT
           TO SUPPRESS CRITICISM……………..…………………….6

     III.   THE CALIFORNIA ANTI-SLAPP STATUTE PROTECTS
           CITIZENS FROM MERITLESS LITIGATION DESIGNED TO
           CHILL SPEECH…………………...…………………………....8

     IV.   TRUMP UNIVERSITY IS A PUBLIC FIGURE BECAUSE IT IS
           INEXTRICABLY INTERTWINED WITH DONALD TRUMP FOR
           FIRST AMENDMENT PURPOSES ………………………...9

     V.    FINDING TRUMP UNIVERSITY TO BE A PRIVATE FIGURE
           WILL CHILL PROTECTED SPEECH BY CITIZEN CRITICS OF
           CORPORATIONS…………………….………………………..14

CONCLUSION……………………………………………...16

CERTIFICATE OF COMPLIANCE……………………………………..17

CERTIFICATE OF SERVICE…………………………………………....18

ii

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569 (2005) .........................................10

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ......................................................3

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ..........................................2

*Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984)..............................................3

*Briggs v. Eden Council for Hope & Opportunity*, 19 Cal.4th 1106 (1999) .............9

*Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967)...................................... passim

*Edenfield v. Fane*, 507 U.S. 761 (1993) ....................................................................8

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ......................................... 5, 6, 13

*Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989)....................3

*Moore v. City of Kilgore*, 877 F.2d 364 (5th Cir. 1989)...........................................7

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)................................... 3, 4, 11

*Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th Cir. 1999)8, 9

*Newton v. National Broadcasting Co.*, 930 F.2d 662 (9th Cir. 1990)......................4

*Pacific Gas and Elec. Co. v. Public Utilities Commission*, 475 U.S. 1 (1986).........7

*Palko v. Connecticut*, 302 U.S. 319 (1937) ...............................................................2

*Price v. Stossel*, 620 F.3d 992 (9th Cir. 2010)......................................................8, 9

*Steaks Unlimited v. Deaner*, 623 F.2d 264 (3d Cir. 1980) .......................................8

*Vegod Corp. v. American Broadcasting Co.*, 25 Cal. 3d 763 (1979).............. 12, 13

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) ......................................................................................................7

*Waldbaum v. Fairchild Publications, Inc.* 627 F.2d 1287 (D.C. Cir. 1980) ..........12

*Weiner v. San Diego County*, 210 F.3d 1025 (9th Cir. 2000)....................................3

## Other Authorities

http://www.marthastewart.com, http://www.themarthablog.com/ (last visited June 2, 2011)............................................................................................................15

Kathryn W. Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on Its Operation and Scope*, 33 LOY. L.A. L. REV. 801 (2000) .......9

Katla McGlynn, *SNL: Tina Fey's Sarah Palin, Darrell Hammond's Donald Trump Return For GOP Presidential Debate* (with video), HUFFINGTON POST, May 8, 2011, http://www.huffingtonpost.com/2011/05/08/snl-tina-feys-sarah-palin_n_859101.html............................................................................................11

Michael A. Memoli and Scott Collins, *Donald Trump: I Won't Run For President*, LOS ANGELES TIMES, May 16, 2011, *available at* http://articles.latimes.com/2011/may/16/news/la-pn-donald-trump-president-20110516 ..............................................................................................................11

Michael Shear, *Obama Releases Long-Form Birth Certificate*, NEW YORK TIMES, April 27, 2011, *available at* http://thecaucus.blogs.nytimes.com/2011/04/27/obamas-long-form-birth-certificate-released/................................................................................................11

Online Video: Trump University and Donald Trump (Trump University 2008) (posted on YouTube), *available at* http://www.youtube.com/watch?v=465T6EDzoH0............................................12

*White House Correspondents Dinner: Obama Takes On Trump, Birthers, The Media, And More* (with video), HUFFINGTON POST, April 30, 2011, http://www.huffingtonpost.com/2011/04/30/white-house-correspondents-dinner-2011_n_855926.html..................................................................................11

## Statutes

Cal. Code Civ. Proc. § 425.16(a) ..............................................................................9

iv

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Undersigned counsel for amicus curiae American Civil Liberties Union of San Diego & Imperial Counties (ACLU-SDIC) states that ACLU-SDIC is a California non-profit corporation with no parent, subsidiary, or stock held by any person or entity, including any publicly held company.

DATED:    June 2, 2011

s/**David Blair-Loy**

David Blair-Loy
Attorney for Amicus

## **INTRODUCTION**

When Tarla Makaeff sued Trump University for deceptive and unethical business practices, the corporation counterclaimed for defamation allegedly arising from her statements to Bank of America and the Better Business Bureau criticizing Trump University's practices. The district court incorrectly denied Makaeff's anti-SLAPP motion because, among other reasons, it erred in holding that Trump University is not a public figure. For First Amendment purposes, Trump University is inextricably intertwined with the notorious persona of Donald Trump, who is indisputably a public figure. Trump University expressly trades on and profits from its close public identification with Donald Trump. It cannot seek the benefits of that identification yet disclaim it when convenient. In these circumstances, Trump University must be deemed a public figure as a matter of law. To hold otherwise would curtail the right to criticize the business practices of entities that expressly trade on the fame and brand of public figures.

## **INTEREST OF *AMICUS CURIAE***

The American Civil Liberties Union of San Diego & Imperial Counties (ACLU-SDIC) is one of the local affiliates of the American Civil Liberties Union, a nationwide, nonprofit, nonpartisan organization dedicated to the principles of liberty and equality embodied in the Constitution. Since its founding in 1920, the ACLU has frequently defended the First Amendment in courts throughout the

1

country. ACLU-SDIC has recently appeared in this Court as *amicus curiae* in cases involving freedom of speech, e.g., *Johnson v. Poway Unified School District*, No. 10-55445, and *Harper v. Poway Unified School District*, No. 07-55224.

The ACLU-SDIC endeavored to obtain the consent of all parties to the filing of this brief. Makaeff consented but Trump University did not. No party's counsel authored any part of this brief. No party or party's counsel contributed money that was intended to fund preparation or submission of this brief. No person other than the *amicus curiae* contributed money that was intended to fund preparation or submission of this brief.

## ARGUMENT

### I. THE FIRST AMENDMENT EQUATES PUBLIC FIGURES WITH PUBLIC OFFICIALS IN REQUIRING THEM TO PROVE ACTUAL MALICE BY CLEAR AND CONVINCING EVIDENCE.

The First Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, states that "Congress shall make no law…abridging the freedom of speech…" This Court needs no reminding that freedom of thought and speech have been said to form "the matrix, the indispensable condition, of nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 327 (1937); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) ("The right to think is the beginning of freedom, and speech must be protected … because speech is the beginning of

2

thought.").  The First Amendment therefore mandates close scrutiny of any rule that would "deprive our free society of the stimulating benefit of varied ideas because their purveyors fear physical or economic retribution solely because of what they choose to think and publish."  *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 151 (1967) (citations omitted).

Because defamation claims are easily abused to chill freedom of speech, the First Amendment "limits the types of speech that may give rise to a defamation action under state law."  *Weiner v. San Diego County*, 210 F.3d 1025, 1031 (9th Cir. 2000) (citations omitted).  In particular, public officials and public figures must generally prove that an allegedly defamatory statement was "made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964).  They must prove "actual malice by clear and convincing evidence."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986).  This standard requires far more than proof that a statement was erroneous or that the speaker was motivated by ill will or hostility.  *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984); *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 666 (1989).  Instead, actual malice is "provable only by evidence that the defendant realized that his statement was false or that he subjectively entertained serious

3

doubt as to the truth of his statement." *Newton v. National Broadcasting Co.*, 930 F.2d 662 (9th Cir. 1990) (citations omitted).

The Supreme Court originated the actual malice standard in *New York Times*. Recognizing that "erroneous statement is inevitable in free debate," the Court imposed the actual malice standard on public officials to prevent a "pall of fear and timidity" from being "imposed upon those who would give voice to public criticism." *New York Times*, 376 U.S. at 271, 278. Because "freedoms of expression" need "breathing space" to survive, a "defense for erroneous statements honestly made is…essential." *Id.* at 271-272, 278. Allowing truth as a defense to defamation is not enough. "Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in a court or fear of the expense of having to do so." *Id.* at 279.

The Court soon extended the actual malice standard to public figures, who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Curtis Publishing Co.*, 388 U.S. 155, 164 (1967). As the Court later explained, "a majority of the Court agreed with Mr. Chief Justice Warren's conclusion [concurring in *Curtis*] that the New York Times test should apply to criticism of

'public figures' as well as 'public officials.'" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 336 (1974).

Chief Justice Warren's reasons for equating public figures with public officials ring equally if not more true today. Any "differentiation between 'public figures' and 'public officials' and adoption of separate standards of proof for each have no basis in law, logic, or First Amendment policy. Increasingly in this country, the distinctions between governmental and private sectors are blurred…. [P]ower has also become much more organized in what we have commonly considered to be the private sector…. [M]any who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Curtis Publishing Co.*, 388 U.S. at 163-164 (Warren, C.J., concurring).

Indeed, criticism of public figures may sometimes be more important than that of public officials. "The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest [the citizenry has in their conduct], since it means that public opinion may be the only instrument by which society can attempt to influence their conduct." *Id.* at 164 (Warren, C.J., concurring). Increased globalization has only made this argument stronger. In today's global economy, large corporations are more

5

powerful than ever. It is daunting for an ordinary citizen to be sued by a multi-billion-dollar corporation or similarly wealthy individual.

In addition, courts treat public figures like public officials because of their ability to effectively rebut any criticism leveled against them. "The first remedy" of anyone claimed to be defamed "is self-help – using available opportunities to … correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz*, 418 U.S. at 344. *See also Curtis Publishing Co.*, 388 U.S. at 155 (citation omitted) (public officials and figures command "sufficient continuing public interest and…sufficient access to the means of counterargument to be able to expose through discussion the falsehood and fallacies of…defamatory statements"); *Id.* at 164 (Warren, C.J., concurring) (public figures have "ready access" to "mass media of communication, both to influence policy and to counter criticism of their views and activities").

## II. CORPORATIONS CANNOT EVADE THE FIRST AMENDMENT TO SUPPRESS CRITICISM.

Large corporations and individuals with deep pockets may try to suppress speech using the court system because they are angered by the criticism. "Humans dislike self-directed criticism. The intolerance within all of us can oversuppress

speech which is otherwise useful either to the speaker or to a listener. The desire to suppress unpleasant or critical speech is almost irrepressible." *Moore v. City of Kilgore*, 877 F.2d 364, 380 (5th Cir. 1989). Commercial entities may also try to suppress criticism because they believe it will hurt their bottom line. Because corporations often have resources which the citizen critic lacks, they are able to intimidate critics with threatened or actual litigation.

Corporations or wealthy individuals attempting to silence critics are just as dangerous to free debate as the government doing the same. If corporations are able to suppress criticism of their products and services, not only do the critics suffer, but other consumers lack the information they need to make informed decisions. "The constitutional guarantee of free speech 'serves significant societal interests' wholly apart from the speaker's interest in self-expression" and "protects the public's interest in receiving information." *Pacific Gas and Elec. Co. v. Public Utilities Commission*, 475 U.S. 1, 8 (1986) (citations omitted). This principle is not limited to political speech. A "particular consumer's interest in the free flow of commercial information…may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763 (1976). People rely on the reputation and reviews of products and services on a daily basis. "The commercial marketplace, like other spheres of our social and cultural life, provides a forum

7

where ideas and information flourish." *Edenfield v. Fane*, 507 U.S. 761,767 (1993). As a result, the rationale for protecting honest but erroneous statements applies with equal vigor to criticism of public officials and a consumer's criticism of business practices. *Cf. Steaks Unlimited v. Deaner*, 623 F.2d 264, 280 (3d Cir. 1980) ("Consumer reporting enables citizens to make better informed purchasing decisions. Regardless whether particular statements made by consumer reporters are precisely accurate, it is necessary to insulate them from the vicissitudes of ordinary civil litigation in order to foster the First Amendment goals" of protecting free debate and informing the public).

### III.   THE CALIFORNIA ANTI-SLAPP STATUTE PROTECTS CITIZENS FROM MERITLESS LITIGATION DESIGNED TO CHILL SPEECH.

Unfortunately, individuals and entities have filed strategic lawsuits against public participation, known as SLAPP's, to deter "citizens from exercising their political and legal rights." *Price v. Stossel*, 620 F.3d 992, 999 (9th Cir. 2010). "The hallmark of a SLAPP suit is that it lacks merit, and is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned, and of deterring future litigation." *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 970-971 (9th Cir. 1999).

Recognizing the vital importance of free debate and concerned with "strategic defamation lawsuits," *Price*, 620 F.3d at 999, California adopted one of the strongest anti-SLAPP laws in the country. The legislature mandated early dismissal of lawsuits brought "primarily to chill the valid exercise of the constitutional right[] of freedom of speech."[1] Cal. Code Civ. Proc. § 425.16(a). By enacting the anti-SLAPP statute, the legislature hoped to "encourage continued participation in matters of public significance," and ensure that such participation was not "chilled through abuse of the judicial process." *Newsham*, 190 F.3d at 971 (quoting Cal. Code Civ. Proc. § 425.16(a)).

In 1997, the anti-SLAPP statute was updated to clarify that the statute "shall be construed broadly." Cal. Code Civ. Proc. § 425.16(a), as amended by Stats. 1997, ch. 271, § 1. As a result, courts should "interpret the First Amendment and section 425.16 in a manner favorable to the exercise of freedom of speech, not its curtailment." *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal.4th 1106, 1119 (1999) (cite omitted).

## IV. TRUMP UNIVERSITY IS A PUBLIC FIGURE BECAUSE IT IS INEXTRICABLY INTERTWINED WITH DONALD TRUMP FOR FIRST AMENDMENT PURPOSES.

---

[1] For a detailed discussion of the legislative history and purposes behind the statute, *see* Kathryn W. Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on Its Operation and Scope*, 33 LOY. L.A. L. REV. 801 (2000).

9

The district court correctly held that Makaeff's speech was on a matter of public interest covered by the statute, which is the first predicate for granting an anti-SLAPP motion. However, the district court erred on the second predicate, the question whether Trump University established a probability of prevailing on the merits, because the court did not hold Trump University to a public figure's high burden of proof.[2] To survive an anti-SLAPP motion, public figures, corporate or otherwise, "must establish a probability that they can produce clear and convincing evidence that the allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity." *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1578 (2005). The question is therefore whether Trump University is a public figure.

It is beyond dispute that Donald Trump is a public figure, as Trump University has properly conceded. Donald Trump has widely promoted himself as successful, rich and powerful. He has thrust himself onto the public stage as one "intimately involved in the resolution of important public questions," *Curtis Publishing Co.*, 388 U.S. at 163-164 (Warren, C.J., concurring). He is credited as the person responsible for compelling the President of the United States to publish

---

[2] This brief's focus on the public figure issue should not be taken to indicate any disagreement with or distance from Makaeff's other arguments.

his long-form birth certificate.[3]  President Obama singled him out at this year's

White House Correspondents' Dinner.[4]  For much of this year, he was publicly

considering a presidential run himself.[5]  He also stars in the reality television

contests "The Apprentice" and "The Celebrity Apprentice."  He is so famous that

he is a recurring persona on Saturday Night Live.[6]  If one runs a Google search for

"Donald Trump," there are "about 38,000,000 results."[7]

The question therefore becomes whether Trump University can divorce itself

from its founder, namesake and chief spokesman for purposes of public figure

analysis.  It may be assumed that Trump University is not Donald Trump's alter

---

[3] *See, e.g.*, Michael Shear, *Obama Releases Long-Form Birth Certificate*, NEW YORK TIMES, April 27, 2011, *available at* http://thecaucus.blogs.nytimes.com/2011/04/27/obamas-long-form-birth-certificate-released/ (last visited June 2, 2011).

[4] *White House Correspondents Dinner: Obama Takes On Trump, Birthers, The Media, And More* (with video), HUFFINGTON POST, April 30, 2011, http://www.huffingtonpost.com/2011/04/30/white-house-correspondents-dinner-2011_n_855926.html (last visited June 2, 2011).

[5] Michael A. Memoli and Scott Collins, *Donald Trump: I Won't Run For President*, LOS ANGELES TIMES, May 16, 2011, *available at* http://articles.latimes.com/2011/may/16/news/la-pn-donald-trump-president-20110516 (last visited June 2, 2011).

[6] *See, e.g.,* Katla McGlynn, *SNL: Tina Fey's Sarah Palin, Darrell Hammond's Donald Trump Return For GOP Presidential Debate* (with video), HUFFINGTON POST, May 8, 2011, http://www.huffingtonpost.com/2011/05/08/snl-tina-feys-sarah-palin_n_859101.html (last visited June 2, 2011).

[7] Google search results, http://www.google.com (type "Donald Trump") (results last viewed June 2, 2011).

11

ego under corporate law. Likewise, the mere fact that Trump University is "doing business" with Donald Trump may not elevate [it] to public figure status." *Vegod Corp. v. American Broadcasting Co.*, 25 Cal. 3d 763, 769 (1979). But Trump University has gone far beyond "doing business" with Donald Trump. As Makaeff has documented, Trump University has inextricably intertwined its public image with Donald Trump's famous persona. To cite only one example, Trump University produced and distributed a promotional video featuring Donald Trump that begins with the text, "Donald Trump Welcomes You."[8] In the video, Donald Trump clearly encompasses Trump University in his self-promoted brand of wealth, power, fame and brilliance.

In deciding the question of law whether Trump University is a public figure, the Court "must look at the facts, taken as a whole, through the eyes of a reasonable person." *Waldbaum v. Fairchild Publications, Inc.* 627 F.2d 1287, 1293 & n.12 (D.C. Cir. 1980). While a business entity may not automatically be a public figure, it is entitled to no special exemption from public figure analysis. As the California Supreme Court has noted, "for purposes of applying the First Amendment to defamation claims, the distinction between corporations and

---

[8] Online Video: Trump University and Donald Trump (Trump University 2008) (posted on YouTube), *available at* http://www.youtube.com/watch?v=465T6EDzoH0 (last viewed June 2, 2011).

individuals is one without a difference." *Vegod*, 25 Cal. 3d at 771. In other cases, formation of a corporate entity may distinguish the entity from its individual owner. However, the First Amendment recognizes no such automatic distinction in public figure analysis. Trump University's status as a public figure must be decided in light of the totality of circumstances, regardless of Trump University's formal status as a separate entity. The Court need not pierce the corporate veil to determine that Trump University is a public figure.

Taken as a whole, the undisputed facts show that Trump University publicly and regularly identifies itself closely with Donald Trump as an individual. As a result, a reasonable person would not distinguish Trump University from Donald Trump for purposes of public figure analysis. Indeed, Trump University does not apparently want people to distinguish between the two. Trump University sells the entire Donald Trump experience; it might be fair to say it sells Donald Trump. Trump University urges people who want to succeed like Donald Trump to go to Trump University, where Donald Trump will teach them how to become like him.

In these circumstances, a reasonable person is entitled to expect that both Donald Trump and Trump University are public figures who have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Gertz*, 418 U.S. at 345. It is too much to expect an ordinary citizen to distinguish between Donald Trump and Trump University in speaking

13

out about Trump University's practices. Instead, the reasonable person is entitled to rely on the fact that Trump University has closely and publicly identified itself with Donald Trump's individual persona. To hold otherwise could "lead to intolerable self-censorship" on issues of clear public concern. *Gertz*, 418 U.S. at 340. Individuals would likely refrain from criticizing business practices of entities created by and closely identified with public figures rather than risk time-consuming and costly litigation on the alleged falsity of their statements.

To treat Trump University as a public figure is a fair and just result. Trump University is expressly trading on Donald Trump's fame as a successful businessman, investor and leader. Trump University cannot identify the company with Donald Trump's persona, trade on his name, benefit from that arrangement, and then disclaim its identification with him when tactically convenient. The corporate form cannot be used to circumvent the First Amendment in this way. When a corporation is as closely identified with a public figure as Trump University is with Donald Trump, both are public figures.

## V. FINDING TRUMP UNIVERSITY TO BE A PRIVATE FIGURE WILL CHILL PROTECTED SPEECH BY CITIZEN CRITICS OF CORPORATIONS.

To rule for Trump University would license public figures to insulate their business practices from criticism simply by laundering them through shell entities. This is especially disturbing when the entity is selling a product or service based

14

on a public figure's name, face and brand. The market is replete with such products. For just one example, consider Martha Stewart, who had her own season of "The Apprentice." She has published multiple magazines, including "Martha Stewart Living," "Weddings," and "Everyday Food." She writes books on all manner of subjects, including sewing, cooking, housekeeping, and managing a business. She has her own show, "The Martha Stewart Show," where she gives the audience advice on those subjects and others. Martha Stewart brand products include furniture, bath accessories, bedding, kitchen essentials, paint, window treatments, and other items for home decoration.[9]

As with Donald Trump, it is difficult for a reasonable person to separate the products from the individual; they are all marketed using Martha Stewart's name, face and brand. For public figure purposes, the distinction between the entity and individual in these circumstances is semantic, not real. Consumers speaking out about products or services marketed by entities identified with public figures should be treated as if they were criticizing the public figures themselves. The First Amendment requires no less.

---

[9] See generally, http://www.marthastewart.com, http://www.themarthablog.com/ (last visited June 2, 2011).

15

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the district court's order denying appellant's anti-SLAPP motion.

Respectfully submitted,

**s/David Blair-Loy**
David Blair-Loy
Attorney for Amicus

Sarah Abshear, assisting

16

## **CERTIFICATE OF COMPLIANCE**

I certify this brief is proportionally spaced, has a typeface of 14 points or more, and based on the word count function of the software used to prepare the brief contains 3,854 words, in compliance with Fed. R. App. P. 29(d), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

DATED:     June 2, 2011

s**/David Blair-Loy**
David Blair-Loy
Attorney for Amicus

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below I served the foregoing

document by transmitting via e-filing to the Ninth Circuit Court of Appeals Case

Management/ Electronic Case filing system, through which all counsel of record

are deemed served.

DATED:      June 2, 2011

s/**David Blair-Loy**

David Blair-Loy
